Lester E. HOTH, Plaintiff and Appellant,

v.

Alma KAHLER, Defendant and Respondent.

No. 7491.

Supreme Court of North Dakota.

Jan. 17, 1956.

M. S. Byrne, Bowman, Strutz, Jansonius & Fleck, Bismarck, for plaintiff and appellant.

Amundson & Amundson, Bowman, Mackoff, Kellogg, Muggli & Kirby, Dickinson, for defendant and respondent.

SATHRE, Judge.

The plaintiff Lester Hoth brings this action against the defendant Alma Kahler for specific performance of an alleged contract of sale of real estate by the defendant to the plaintiff.

The complaint alleges that on February 29, 1952, the defendant sold to the plaintiff the E½ of Section 15, Township 131, Range 101, County of Bowman, State of North Dakota, at the agreed price of $5,000 payable in cash and that the defendant agreed to convey the same by warranty deed to plaintiff; that under the terms of said sale plaintiff agreed to and with the said defendant to deposit $5,000 in the First National Bank of Bowman, North Dakota, in escrow for the benefit of said defendant and to be remitted to said defendant upon delivery to plaintiff or to the bank of abstract of title and warranty deed conveying the said described land to the plaintiff and that the defendant agreed forth-

with to forward to said bank the said abstract of title and warranty deed.

That thereafter and on the 29th day of February 1952 and in accordance with the terms of sale of said described premises plaintiff did deposit in the First National Bank of Bowman, North Dakota, the sum of $5,000 in escrow to be paid to the defendant upon delivery to plaintiff or to the said bank of abstract of title to the said described premises and warranty deed duly executed by the defendant and conveying said premises to the plaintiff.

The plaintiff then alleges that the said defendant has failed and refused and still refuses and neglects to convey the real property described, though requested to do so and has failed and refused to carry out the terms and covenants of said sale in violation of and contrary to the terms and obligations of said contract of sale. Plaintiff alleges further that he has performed all of the conditions, covenants, stipulations and provisions of said contract of sale but that the defendant has refused and still refuses to execute a deed to plaintiff of the said described premises and has failed and refuses to execute a deed to plaintiff to the said described premises and has failed and refused and neglected to carry out the terms under said contract of sale; that the plaintiff is ready, willing and able and in fact has tendered the sum of $5,000 the purchase price of the said described premises under the terms of said sale by placing said sum in escrow at the First National Bank at Bowman, North Dakota, to be delivered to said defendant upon delivery of the abstract of title and the properly executed warranty deed to the plaintiff and that the said sum of $5,000 is still in escrow in the First National Bank of Bowman, North Dakota. The complaint further alleges that the plaintiff is now ready, able and willing to tender the said amount of said sale to-wit: the sum of $5,000 to the defendant upon compliance with the terms of said contract of sale.

The complaint then demands judgment that the defendant specifically perform the provisions, covenants, and obligations of said contract of sale and for such other and further relief as the court may deem just and equitable.

The amended answer of the defendant admits that she was the owner of the premises described in the complaint on the 29th day of February 1952 but denies each and every other allegation contained in the complaint. As a further defense the answer alleges that the alleged agreement for the sale of the land described in the complaint is invalid as the same is not and never was in writing subscribed by the defendant or by her agent and that there never was at any time a note or memorandum thereof in writing subscribed by the defendant or by her agent.

For a further and separate defense the defendant alleges that the supposed contract, if there was a contract, was induced by mistake and fraud; that said fraud consists of fraudulent and material misrepresentations made by the plaintiff to the defendant and on which the defendant, believing them to be true relied, to the effect that the land was no longer wanted by the defendant's tenant; that the land was poor and run down, and that by reason of said mistake and fraud the alleged contract, if any, is null and void and the defendant is not bound thereby. Judgment is then demanded for dismissal of the action.

The facts and circumstances giving rise to this action are as follows:

On February 22, 1952, the plaintiff wrote to the defendant the following letter:

"Dear Madam:

"In reference to the East Half of Section 15, Township 131, Range 101. We have the land adjoining it on the east. I contacted Mr. E. Hilton, the tenant of the land, last fall and he stated and I quote him in saying your land is becoming very run down and it produces very poorly. He wishes for me to rent it from you.

"Mr. Hilton is one of the best farmers in this county and if he can't make it produce, I am certain I couldn't do any better, unless

I owned the land and used soil building practices for years.

"I am interested in purchasing the land from you. If you would consider selling, please state me a hard cash offer.

Please reply immediately. I am enclosing stamped, self addressed envelope for your reply.

> "Very truly,
> /s/ Lester .E. Hoth."

On February 28, 1952, the plaintiff not having heard from the defendant, either he or his secretary called the defendant by long distance telephone at Grand Island, Nebraska. Plaintiff's testimony in reference to this telephone conversation is as follows:

> "I telephoned Mrs. Kahler and I told her that I had sent her a letter asking to buy her land and that I wished for her to make me an offer and set the asking price and she said the asking price for my land is $5000.00. I said, I will take it. I will put the money up at the bank tomorrow morning. She said she would supply a deed and send me the abstract for examination."

A letter from the defendant to the plaintiff dated February 27, 1952, plaintiff's exhibit 5, in answer to his letter of February 22, was already in the mail when he called her by telephone. This letter is as follows:

"Dear Sir:

"I recd your letter stating that you would like to buy east half of Section 15—township 131—range 101. I plan to either sell or rent it, but I would rather sell it, however Mr. Hilton has a year yet to go on his lease. You mentioned in your letter that Mr. Hilton said the land was run down, no doubt it is he ought to know he has been farming it for a long time, but I would like to point out a few figures that would make things a little more clear to you. My father purchased this land in 1908 from J. H. Coon for a sum of $5600.00, the records will show this. So I will put down some figures to show you what the land has produced in the last few years. I will start from the yr. 1947 to 1951. I will have to leave out 1949 as I cannot find the figures of that yr. at this time, anyway this will give you an idea on how things have been going. This is the following of Mr. Hilton's own figures, can furnish you original figures and letters on request. For the yr. of 1947 the land produced $4185.28—yr. of 1948—$7000.00—yr of 1950 $4561.48—yr of 1951 $3318.96, of this yr. we took a loss of about 18¢ a bush. because of wet grain. So you see this cut out take down considerable, but all this goes with the farming business. But anyway it leaves a total for the 4 yrs. mentioned above at $19065.72. I recd ¼ of this amt. which amounts to $4766.43 and Mr. Hilton's share was $14299.29, so the average take per year for the 4 years mentioned above amt. to $4766.43 which is only $233.57 less the price of this land which is $5000.00. You see I live in the heart of the grain belt and there is no land here that can produce its purchase price in a single yr. like this land has done and there is less than ⅔ of it being farmed at that, so it is like you say if this land is built up a little it would make a pretty good farm. The only reason I want to sell this land is because it is so far away from here. But of course if I don't sell it and no one wants to rent it, I think I will lease it to an oil Co. One Co. in particular has made me a pretty fair offer and then the land can rest for a while. Back in 1908 when my father first purchased this land, there was an Oil Co. that wanted an oil lease on this land, what made them interested in this particular spot was because of a certain under-ground *confirmation*. They seem to think there was oil there, why he didn't give them a lease, I don't know. So if you are interested please let me know.

> "Very truly
> Mrs Alma Kahler
> 418 N. Carey Ave.
> Grand Island, Nebraska."

On February 29, 1952, the First National Bank of Bowman sent to the defendant a wire, plaintiff's exhibit 2, as follows:

"Feb. 29, 1952

> Alma Kahler—418 N. Carey Ave. Grand Island, Nebr.

"We hold in escrow $5000.00 from Lester Hoth, your deal on East Half of Section

15, subject to receipt of deed and abstract. Wire privilege of title examination.

"The First National Bank of Bowman."

On February 29, 1952, the defendant sent to the First National Bank of Bowman a wire as follows: Plaintiff's exhibit 1:

"First National Bank,
Bowman, North Dakota.

"I am sending abstract for examination a letter will follow

"Alma Kahler."

On February 29th, the defendant also wrote a letter to the First National Bank of Bowman, which is as follows:

"The First National Bank,
Bowman, North Dakota.

"Dear Sirs:

"I am in receipt of a wire today from the First National Bank of Bowman advising that you hold $5000.00 in escrow from Lester Hoth with reference to a deal on the East Half of Section Fifteen (15). I presume that you desire the Abstract of Title forwarded for the examination of purchaser, and I am enclosing herewith Abstract of Title to the East Half of Section Fifteen (15) Township One Hundred Thirty-One (131) North, Range One Hundred One (101) West of the 5th P.M. You may deliver this Abstract to prospective purchaser for his title examination, and I presume that the Abstract will have to be extended to date, which expense I will bear, however, should the expense be unusual I should like to be advised before proceeding. I will await your advise as to the Deed, which I can have prepared here and forward to your bank with instructions. Kindly advise to whom you wish this Deed made out, and any other instructions pertinent to the sale of this land.

"Respectfully yours,
Alma Kahler."

On March 3rd the First National Bank of Bowman sent a telegram to the defendant Plaintiff's exhibit 4, which is as follows:

"Alma Kahler   March 3, 1952
418 North Carry Ave.
Grand Island, Nebraska

"Received Abstract, title approved; send Deed favor Lester E. Hoth, he shares abstract costs, will remit on approval of deed when received.

"First National Bank of Bowman."

On March 6, 1952, the defendant wrote to the First National Bank of Bowman the following letter, defendant's exhibit A, which is as follows:

"First National Bank,
Bowman, North Dakota.

"Dear Sir:—I will try and explain in this letter how this deal got started so you to will understand the situation. Lester E. Hoth wrote me a letter dated Feb. 22—1952. Mr. Hoth said in his letter that he contacted Mr. Hilton (the tenant of the land) and he said that Mr. Hilton informed him that the land was becoming very poor & he wished that Mr. Hoth would write me in regard to renting it, but Mr. Hoth said he would rather buy it. So I wrote Mr. Hoth a letter & told him that Mr. Hilton still had another yr. to go on his lease. But I told Hoth that if Mr. Hilton didn't want the land anymore I would sell it to him. From the way Hoth wrote in his letter I took it for *granite* that he was a friend of Mr. Hilton and was telling the truth. I thot it strange though he wanted to close the deal so quick and also thot it strange that I didn't hear from Mr. Hilton, who has proved to me in the last 8 yrs. that he is a very reliable man. So I wrote Mr. Hilton a letter explaining the situation to him as it stood to date. Mr. Hilton called me long distance just as soon as he got my letter and he said he didn't tell Hoth that he didn't want the land, in fact he said he wanted to buy it himself. If you want to see the letter I wrote Mr. Hilton, I am sure he will show it to you. If not I have a copy here, in fact copies of all the transactions up to date. So now the way things stand I am selling the land to Mr. Edgar Hilton at a price of $6000.00 & he is to have all mineral rights. He is to put the $6000.00

in your bank for me and you can send the $6000.00 to my address, upon approval of deed and abstract. I hope this meets Mr. Hoth's approval. I am sorry it turned out this way. I *tryed* to be fair in dealing with Mr. Hoth, but he *wasnt* fair to Mr. Hilton or myself. So please let me know when every-thing is ready and we will go on with the deal.

"Very truly,

Alma Kahler."

On March 6, 1952, the defendant wrote to her tenant Edgar Hilton the following letter, defendant's exhibit D:

"Mr. Edgar Hilton,
Bowman, North Dakota.

"Dear Mr. Hilton:

"I thought it best to drop you a line so that I could explain a few things to you. I am sorry I didn't write you a letter in the first place, but I thought he was a personal friend of yours the way he wanted to close the deal so quick that I became suspicious. So I want you to stand up for yourself and don't let them bluff you out and I will do the same. All I did was to send the abstract up there for examination and the bank has it in their possession. I also called the bank right after I talked to you and I instructed them what to do and I also sent them a letter with instructions. Mr. Hoth may kick up a little fuss but there is nothing he can do about it because he didn't tell me the truth about the matter and I have a letter here to prove it. I have always been fair in my dealings and I want to stay that way. I want you to have the land because the dealings I have had with you in the past have always been satisfactory. I know this will make a good deal for you. There has been some oil company that has made us a pretty good offer. If you would like to have the letters I will send them to you. So please keep me posted on how things are progressing. As soon as things are straightened out to everyone's satisfaction I will send the deed made out in your favor. Please in-

form me if you want it made out in your and your wife's name or yours alone.

"Yours truly,

James Kahler,
418 North Carey Avenue,
Grand Island, Nebraska.

"P.S. All taxes are paid and everything is free and clear."

On March 29, 1952, a firm of attorneys at Grand Island, Nebr., wrote the following letter, defendant's exhibit B, to the First National Bank of Bowman, North Dakota.

"First National Bank,
Bowman, North Dakota.

"Gentlemen:

"Mrs. Alma Kahler of this city has requested us to ask you to return the abstract which she sent you some time ago and which you acknowledged receipt of by telegram dated March 3, 1952.
"If there is any charges please send us the statement and she will remit for the same.

"Very truly yours,
Cunningham, McDermott
& Cunningham."

Defendant's exhibit C is a letter from the First National Bank to Cunningham, McDermott & Cunningham, dated March 31, 1952 and is as follows:

"Cunningham, McDermott & Cunningham,
Cowton Building,
Grand Island, Nebraska

"Attention: B. J. Cunningham

"Dear Sir:

"In accordance with your letter of the 29th of March we are returning herewith the abstract of title covering the East Half of Section 15–131–101, Bowman County, which we received from Alma Kahler with her letter of February 29, 1952.

"Our fee in connection with handling and mailing will be $1.00.

"Very truly yours,

D. G. Hogoboom, Cashier."

The case was tried in district court, Sixth Judicial District, Bowman County, before the Hon. J. O. Wigen without a jury. The plaintiff contended that the correspondence and telegrams constituted a valid contract for sale by the defendant of the land described in the complaint. The defendant contended first, that the correspondence relied upon by the plaintiff was not sufficient as a note or memorandum under the statute of frauds; and, that even though the correspondence was sufficient as a memorandum in writing, nevertheless the defendant was induced to enter into an agreement through fraud and misrepresentation on the part of the plaintiff made in his letter to the defendant of February 22, 1952.

The district court decided in favor of the defendant principally on two grounds; 1st, that there had been misrepresentation on the part of the plaintiff when he stated that the tenant Mr. Hilton was not interested in farming the land any longer, and 2nd, even if there had been a valid contract of sale there was an abandonment by plaintiff because of the fact that the bank had returned the abstract to the defendant's attorneys in response to their letter of March 29, 1952, requesting the return of the abstract to them.

The plaintiff appealed and demanded a trial de novo in this court.

The first question for consideration is whether the correspondence, telegrams and other communications between the parties are sufficient to constitute a complete and valid contract of purchase and sale.

The negotiations between the parties were initiated by plaintiff's letter, plaintiff's exhibit 9, to the defendant, dated February 22, 1952, in which he stated he was interested in buying the land in question and asked for a "hard cash" offer. On February 28th not having received a reply to his letter of February 22nd, he called the defendant by long distance telephone and was told by defendant that a reply to his letter was in the mail and that the asking price of the land was $5,000. He advised the defendant that he would put up the money in the bank the next morning. Defendant's reply to plaintiff's letter of February 22nd, plaintiff's exhibit 5, was received by him on February 29th. In this letter defendant stated that her price was $5,000. The letter contained a detailed statement of the proceeds of the crops raised on the land during the years 1947, 1948, 1950 and 1951, and that the total value of the crops during those years was $19,065.72. The purpose in making this detailed statement of the value of the crops raised during the four years was undoubtedly in answer to plaintiff's statement that the land "produces very poorly."

On February 29, 1952, the First National Bank of Bowman sent to defendant a telegram, plaintiff's exhibit 2, advising that the bank held $5,000 in escrow from the plaintiff subject to receipt of deed and abstract, and asked for privilege of title examination. The check was introduced in evidence as plaintiff's exhibit 8, dated February 29, 1952, payable to First National Bank, Bowman and had this notation: "Deed and abstract, E½–15–131–101, Alma Kahler." On the same day, February 29th, the defendant wired the bank that she was sending abstract for examination and stating that letter would follow. On the same day defendant wrote the bank acknowledging receipt of its telegram and enclosing abstract and asked to whom deed was to be issued. On March 3rd the bank sent a telegram to defendant, plaintiff's exhibit 4, stating that title was approved and that deed was to be issued to Lester Hoth, and that remittance would be made on approval of deed. It is admitted that in all these transactions the bank was agent of the plaintiff.

Meanwhile the defendant had communicated with Hilton and found that he was willing to buy the land. Defendant offered the land to Hilton for $7,000 but finally agreed to sell it to him for $6,000. Defendant then wrote the letter of March 6th, defendant's exhibit A, to the Bowman Bank explaining why she had repudiated the sale to the plaintiff advising the bank that Hilton was to deposit $6,000 in the bank to be sent to her upon approval of deed and

abstract. On the same date she wrote a letter to Edgar Hilton in which she sought to explain why she had repudiated the sale to the plaintiff and in which she stated among other things: "as soon as things are straightened out to everyone's satisfaction I will send the deed made out in your favor." .

It seems clear from the correspondence, telephone conversation and telegrams between the parties that there was an offer by the defendant to sell the land in question for $5,000 and an acceptance of the offer by the plaintiff. There was no disagreement as to the terms of the sale. The defendant sent the abstract of title to the bank. The bank advised defendant that the title was approved and directed her to issue deed to Lester Hoth, the plaintiff. There was full compliance of the sales agreement by the plaintiff. The money was on deposit in the bank for payment to defendant on receipt of the deed. There was no ambiguity as to the conditions to be performed by the seller or the buyer. No objection was made by the defendant that the plaintiff had not fulfilled his part of the agreement. Defendant was advised by the bank that the title was approved and that the purchase price would be paid on receipt of deed to plaintiff.

■ The party to be charged in the instant case is the defendant and we think that the letters and telegrams sent by her ·to the plaintiff and to the bank constitute sufficient writing and memoranda to satisfy the statute of frauds. In the case of Goetz v. Hubbell, 66 N.D. 491, 266 N.W. 836, 838, this court said:

"An agreement for the sale of real property is invalid 'unless the same, or some note or memorandum thereof; is in writing and subscribed by the party to be charged.' Compiled Laws [Sec. 5888]. Ordinarily, such memorandum would be an informal notation in writing of the salient features of the contract for purchase and sale and would state the provisions necessary to be included in the formal contract; but these need not be set forth in any set order. Neither is there any requirement that the memorandum itself shall be one document. 'Any kind of document or documents, taken singly or together, may constitute the required memorandum, if the terms of the contract are sufficiently stated therein.' If these documents 'show who are the contracting parties, intelligently identify the subject matter involved, express the consideration, and disclose the terms and conditions upon which the contract is entered into,' then the memorandum is sufficient."

"A contract, in order to be specifically enforceable, must be complete in itself with respect to all its terms or parts, or at least with respect to its essential and material terms, parts, and elements, it must be capable of being performed without adding to its terms; and it must not leave a material and essential term or element for future negotiation and settlement. The court cannot supply an important omission or complete a defective contract for the purpose of specific performance. Where, however, all the essential elements of a contract are stated, a failure to include other provisions which might properly have been incorporated does not prevent a decree of specific performance; and terms which the law implies need not be expressly stated. Further negotiations after the contract has been completed do not prevent specific performance of the contract. It is no defense that the agreement must be gathered from more than one instrument where they may fairly be construed as constituting one writing." 81 C.J.S. Specific Performance, § 35, pages 494, 495, 496.

■ We are of the opinion that the correspondence, telegrams and transactions. had between the parties were sufficient to satisfy the statute of frauds and to establish a valid contract for the sale and purchase of the land described in the complaint.

The next question for consideration is whether the defendant was induced to enter into the agreement to sell through fraud and misrepresentation on the part of the plaintiff.

The misrepresentation complained of by the defendant is that the plaintiff stated in his letter to the defendant of February 22, 1952, that Mr. Hilton, defendant's tenant, did not care to farm the land in question any longer and that he suggested that plaintiff farm the land. We quote from the letter:

"I contacted Mr. E. Hilton, the tenant on the land, last fall and he stated and I quote him in saying your land is becoming very run down and it produces very poorly. He wishes for me to rent it from you. Mr. Hilton is one of the best farmers in this county and if he can't make it produce I am certain I couldn't do any better, unless I owned the land and used soil building practices for years."

It will be noted that plaintiff did not say that Hilton did not wish to buy the land.

The defendant's reply to this letter would indicate that she did not believe the land was "run down". She produced figures showing that during the years 1947, 1948, 1950 and 1951 the land in question had produced crops to the total value of $19,065. Then she writes, "I rec'd ¼ of this amount which amounts to $4766.43 and Mr. Hilton's share was $14,299.29, so that the average take per year for the 4 years mentioned above amt. to $466.43 which is only $233.57 less the asking price of this land which is $5000.00. You see I live in the heart of the grain belt and there is no land here that can produce its purchase price in a single yr. like this land has done and there is less then ⅔ of it being farmed at that, so it is like you say if this land is built up a little would make a pretty good farm." She stated further: "The only reason I want to sell this land is because it is so far away from here. But of course if I don't sell it and no one wants to rent it I think I will lease it to an Oil Co."

It is evident from what defendant said in this letter that she was not much impressed with plaintiff's statement that the land "produced poorly". She discussed the good qualities of the land and was demonstrating its productivity. In other words her statements were in the nature of a "sales talk" by one who has property for sale.

With reference to the alleged misrepresentation made by plaintiff in his letter of February 22, 1952, plaintiff's exhibit 9, the plaintiff testified on cross-examination as follows:

"Q. Did you have a conversation with Mr. Hilton about this land? A. Yes.

"Q. When? A. I recall it was the fall of 1951.

"Q. Is that right? A. Yes.

"Q. Do you know where the conversation was held? A. In the pool room in Bowman. In the bar.

"Q. Who was present at the time? A. The bar was full of people.

"Q. You don't remember any particular individual? A. My father.

"Q. Anyone else? A. Not in the conversation.

"Q. You three were there? A. Yes.

"Q. What was said by you and what was said by Mr. Hilton at that time? A. Mr. Hilton said to my father and I, 'Do you fellows want to farm Section 15?' We said we didn't know. 'Well', he says, 'it is getting so now it is all wild oats. I don't want it any more.'

"Q. That is what he told you? A. Yes.

"Q. In the fall of 1951? A. That is right.

"Q. That is the only conversation you had with him? A. Yes.

"Q. He didn't say he wanted you to rent it? A. Yes."

Plaintiff's father, Henry Hoth, who was present during the conversation with Hilton, testified as follows:

"Q. What relation, if any, are you to the plaintiff in this action? A. That is my son.

"Q. Have you or have you not been present in the courtroom during the time your son was on stand? A. Yes.

"Q. Did you or did you not hear his testimony? A. Yes.

"Q. Do you or do you not recall being in a certain bar room in the fall of 1951 wherein a purported conversation took place between Mr. Hilton, yourself and your son? A. Yes.

"Q. Do you recall that conversation? A. Yes.

"Q. What was that conversation? What was said by Mr. Hilton, by yourself and by your son? A. I asked him how the crop was out there. He said, 'Not very good. Too much wild seed.' I said, 'Why don't you strip it?' He said, 'The people that own it don't want it stripped. They want it all farmed.' He said, 'Why don't you rent it?' My son said, 'Wouldn't farm it unless I stripped it and I wouldn't strip it unless I owned the land.'"

The testimony of Hilton relative to the said conversation is that in the fall of 1951 he was "in the pool hall or one of those places." He testified that "the only time I remember was a couple of years ago when I said it was kind of getting run down." He was asked on cross-examination, "You don't remember stating you wanted the plaintiff and his father to rent it? A. I don't remember, I don't believe so. I am sure I didn't."

"Q. You never told them the land was run down? A. All I remember telling them was that it need summer

fallowing and was getting a lot of wild oats in it."

With reference to the alleged misrepresentation in plaintiff's letter of February 22, 1952, plaintiff's exhibit 9, the defendant Alma Kahler testified as follows:

"Q. Did that influence you in offering the sale of this land to him and that you had an asking price of $5000.00. Did that affect your judgment? A. It did.

"Q. Did you at any time intend to sell the land if Mr. Hilton still wanted it? A. If Mr. Hilton intended to buy it we intended to sell it to him some time.

"Q. So you were influenced by that letter? A. Yes.

"Q. Did you communicate with Mr. Hilton to find out what his intentions were? A. Well, I thought it was rather strange that Mr. Hoth would write such a letter so that is the reason I wrote to Mr. Hilton right away.

"Q. And did you find out it wasn't true that Mr. Hilton didn't want the land? A. It was not true.

"Q. Did you write a letter to Mr. Hilton after you received this letter? A. Yes.

"Q. You wrote and informed him as to what had been going on? A. Yes.

"Q. You wrote Mr. Hilton more than once? A. Yes."

On cross-examination defendant testified further as follows:

"Q. When did you first decide you wanted to sell this land? A. We, we had thought over it quite a little while. It was so far away from home. That is why we wanted to sell it. We always had Edgar in mind.

"Q. Had you talked to him before? A. Yes.

"Q. He didn't want to buy it then? A. At that time we weren't quite ready.

"Q. What do you mean? A. We just hadn't thought much about it.

"Q. But at the time you wrote this letter you were definitely in a mood to sell it? A. Yes."

It is quite clear from defendant's testimony that although she testified that "we had always had Edgar (Hilton) in mind," she seized the first opportunity to sell her land to the plaintiff. If she were so interested in selling to her tenant she could just as easily have communicated with him before she made the sale to the plaintiff as after she made the sale. The clear inference from her conduct is that she wanted to make sure she had a buyer. She was evidently negotiating with Hilton for sale of the land after she made the deal with the plaintiff. She first asked Hilton $7,000 as a purchase price, and when he agreed to pay $6,000 she attempted to repudiate her sale to the plaintiff. The sale to the plaintiff was completed on March 3rd when the Bowman bank wired defendant that title was approved and asking that deed be made in favor of Lester Hoth. The letter of the defendant to the Bowman bank in which she repudiated the sale to the plaintiff was not written until March 6th. In this letter she gives direction to the bank that Hilton is to place $6,000 in the bank to be sent to her upon approval of deed and abstract. She is not convinced, however, that she has been fair to the plaintiff, for she says, "I hope this meets Mr. Hoth's approval. I am sorry it turned out this way. * * * So please let me know when everything is ready and we will go on with the deal."

In defendant's exhibit D, the letter from the defendant to her tenant, Hilton, dated March 6th, she stated:

"I am sorry I didn't write you a letter in the first place, but I thought he was a personal friend of yours the way he wrote in his letter but he wanted to close the deal so quick that I became suspicious."

But although she became suspicious because "he wanted to close the deal so quick", she nevertheless made an offer to sell the land to the plaintiff for $5,000 cash and which plaintiff accepted before she, the defendant, communicated with her tenant.

The conduct of the defendant would indicate that her main interest was to secure a buyer for her land. She admitted that she was definitely in a mood to sell it. She did not contact her tenant until after she had agreed to sell the land to the plaintiff, and she did not attempt to repudiate the sale to the plaintiff until her tenant offered to buy the land for $6,000 or $1,000 more than the price for which she agreed to sell it to the plaintiff. We come to the conclusion therefore that the sale to the plaintiff was not induced through fraud or misrepresentation on his part.

Defendant further contends that there was an abandonment of the contract by the plaintiff for the reason that the Bowman bank, upon request by a firm of attorneys in Grand Island, Nebraska, returned the abstract of title to the land involved here. The letter written to the bank by said attorneys did not mention the land deal. It simply stated that Alma Kahler had requested them to ask the return of the abstract sent to the bank some time ago. The fact that the bank returned the abstract as requested certainly cannot be considered as an abandonment of plaintiff's agreement to buy the land. The claim of abandonment by the plaintiff is therefore without merit. The cashier of the bank testifying in this matter admitted that he returned the abstract, but he stated that the bank still held the sum of $5,000 for payment to defendant.

During the trial in district court it was stipulated that plaintiff's account in the First National Bank of Bowman, the bank where the $5,000 check was held in escrow for defendant, that plaintiff's balance was less then $5,000 until March 10, 1952. However the cashier of the bank testified that the bank was obligated to pay and would pay the $5,000 to defendant upon receipt of the deed; he testified further that

plaintiff had wheat on hand which he would sell to replenish his account and would sell same within a few days. The defendant never questioned plaintiff's financial ability to pay the purchase price. The bank wired defendant on February 29th that the purchase price of $5,000 would be sent to her upon approval of the title and receipt of deed. She was duly notified by the bank on March 3rd that title was approved and that remittance would be made upon receipt and approval of the deed.

The defendant-respondent argues in her brief that there is uncertainty as to the form of deed that defendant was to furnish under the terms of the agreement between the parties because the following telegram from the Bowman bank to the defendant does not specify the form of deed to be furnished:

"Received abstract, title approved: send deed favor Lester Hoth, he shares abstract costs, will remit on approval of deed when received."

The defendant never raised any question as to the form of deed she was to furnish and it was not an issue in the case. Her refusal to make the sale was based on other grounds. However, the general rule in such cases is stated in 55 Am.Jur., Vendor and Purchaser, page 747, Section 315, as follows:

"The rule of the English courts and that of the majority of the courts in this country is that in every contract for sale of land the vendor, unless he acts in a ministerial or fiduciary capacity, or unless there is something in the terms of the contract or attendant circumstances which shows a contrary intention, impliedly engages not merely to give a good title, but also to convey by a deed containing the usual covenants of title. It has been said in this connection that if the purchaser is entitled to a good title and is to accept a deed by which the agreement of the vendor to convey such a title is satisfied, the deed should be such as would, in the

event of a paramount title ousting him, give all the right to recover the purchase money which existed in the agreement before it was satisfied by the acceptance of the deed. Accordingly, it has been held that a complaint alleging that a vendor obligated himself to convey land 'in fee simple by warranty deed' may be supported by title bonds reciting that he would convey the land 'by good and valid deed or deeds in common form'. This does not constitute a variance, for a good and valid deed in common form is, in legal effect, a warranty deed."

Section 47–1019, NDRC 1943, defines covenants implied in the use of the word "Grant" as follows:

"From the use of the word 'grant' in any conveyance by which an estate of inheritance or fee simple is to be passed, the following covenants, and none other, on the part of the grantor for himself and his heirs to the grantee, his heirs and assigns, are implied unless restrained by express terms contained in such conveyance:

"1. That previous to the time of the execution of such conveyance, the grantor has not conveyed the same estate, nor any right, title, or interest therein, to any person other than the grantee; and

"2. That such estate, at the time of the execution of such conveyance, is free from encumbrances done, made, or suffered by the grantor, or any person claiming under him. Such covenants may be sued upon in the same manner as if they had been inserted expressly in the conveyance."

■ In the case of Skinner v. Stone, 144 Ark. 353, 222 S.W. 360, 11 A.L.R. 808, Syllabus 2, states the rule as follows:

"Where the contract provided for the sale of the land without specifying the kind of conveyance, it will be implied

that a conveyance of the fee by deed with general warranty was intended."

In the case of Petre v. Slowinski, 251 Wis. 478, 29 N.W.2d 505, 507, The Supreme Court of Wisconsin said:

"As to the second question, it is well settled that where no provision indicating the character of the title is made in a contract for the sale of real estate, the law implies that the vendor is to convey a marketable title free from incumbrances. 55 Am.Jur. p. 619, § 149; Curtis Land & Loan Company v. Interior Land Company, 137 Wis. 341, 347, 348, 118 N.W. 853, 129 Am.St.Rep. 1068. Respondents are therefore entitled to the statutory warranty deed provided for in sec. 235.06, Stats."

■ It is also contended by the defendant that she could not give a warranty deed because her tenant's farm lease of the land had a year to run. We think this fact is of no consequence because plaintiff had full notice of the unexpired lease before he entered into the purchase agreement and therefore was aware of the rights of the holder of the lease.

■ We conclude that the record and the evidence establish a valid agreement of purchase and sale between the parties of the real state here involved; that the plaintiff has performed his part of the agreement and is entitled to a decree requiring specific performance by the defendant.

The judgment is reversed and the case remanded to the district court with directions to enter judgment in conformity with this opinion.

BURKE, C. J., and MORRIS, JOHNSON, and GRIMSON, JJ., concur.