Katherine ROHRICH, Plaintiff
and Appellee,

v.

Elizabeth KAPLAN, Defendant
and Appellant.

Civ. No. 9261.

Supreme Court of North Dakota.

Dec. 23, 1976.

Rehearing Denied Jan. 20, 1977.

802

Daniel J. Chapman, Bismarck, for plaintiff and appellee.

Gerald A. Kuhn, Napoleon, for defendant and appellant.

ERICKSTAD, Chief Justice.

Elizabeth Kaplan appeals a Judgment of the Kidder County District Court ordering specific performance of a contract for the sale of certain real property by her to Katherine Rohrich. In a trial without a jury, the court found that an oral contract existed and was made enforceable by a written memorandum and part performance. Mrs. Kaplan assigns error to this finding and argues alternatively that the contract had been properly rescinded, and even if it had not, specific performance was not proper because of the equities of the situation.

Mrs. Rohrich alleges in her complaint that, at the time this action was commenced, she and her husband and family had resided upon certain property for approximately 15 years; that in August, 1960, an agreement was reached between herself and her husband on one hand, and Elizabeth Kaplan, the legal owner of the land, on the other, to purchase this property over a period of time; that payments were made from time to time on the purchase price; that Mrs. Kaplan denied the existence of the contract and, though she has not canceled the contract or sought to remove Mrs. Rohrich and her husband from the property, refuses to fulfill the terms of the agreement; that the contract has been partially performed and is supported by a memorandum in writing containing the essential terms of the contract; and asked that the district court establish the existence of the contract and order specific performance.

Mrs. Kaplan answered, denying that a land sale contract was ever made, and arguing, alternatively, that if it was, it is unenforceable because of the Statute of Frauds.

The first issue presented by the appellant, whether the trial court was correct in finding that a contract existed and was represented by a sufficient memorandum to take it out of the Statute of Frauds, is technically two issues, but, since the value of the memorandum is its proof of the existence of an enforceable contract, this shall be resolved as one issue.

Our initial consideration is the appropriate North Dakota Statute of Frauds:

"The following contracts are invalid, unless the same or some note or memorandum thereof is in writing and subscribed by the party to be charged, or by his agent:

"1. An agreement that by its terms is not to be performed within a year from the making thereof;

.    .    .    .    .

"4. An agreement for the leasing for a longer period than one year, or for the sale, of real property, or of an interest therein. Such agreement, if made by an agent of the party sought to be charged, is invalid unless the authority of the agent is in writing subscribed by the party sought to be charged." § 9–06–04, N.D.C.C.

Pertinent also is Section 47–10–01, N.D.C.C.

■ Mrs. Rohrich put into evidence several letters, allegedly subscribed by Mrs. Kaplan and Sig Gryttenholm (Mrs. Kaplan's late husband), offered to establish a memorandum in compliance with Section 9–06–04, N.D.C.C., *supra.* It is settled in this State that a memorandum taking an oral agreement out of the Statute of Frauds may consist of several individual documents. *Heinrich v. Martin,* 134 N.W.2d 786 (N.D.1965), *Hoth v. Kahler,* 74 N.W.2d 440 (N.D.1956).

■ A memorandum is sufficient to take an oral contract out of the Statute if it discloses the identity of the contracting parties, the subject matter of the agreement, and the expressed consideration, as well as the terms and conditions upon which the contract was entered into. *Johnson v. Auran,* 214 N.W.2d 641 (N.D.1974); *Hoth v. Kahler, supra; Goetz v. Hubbell,* 66 N.D. 491, 266 N.W. 836 (1936).

■ The identity of the parties is well established from the greetings and signatures of several letters in evidence, and there is no dispute on this point. The requisite showing of the subject matter of the

agreement presents more of a problem, however.

There is nothing in any of the letters referred to above which purports to be a "legal description" of the land, though this is clearly the subject matter of the claimed contract. The property is referred to in these letters as "the farm", "our farm", "that farm", "that farm of ours", "farm in Steele", and "the property". As to whether these references are adequate to describe the land (the subject matter of the agreement), our attention has been directed to the following language in an annotation entitled "Statute of Frauds—Description of Land":

> "A designation of land by ownership may of course be made without inclusion of any further element of description or qualification (as 'my land'), or it may be conjoined with an indication of the nature of the property (as 'my farm,' 'my house,' etc.) or with a specification of the size, general locality, occupancy, source of title, popular name, distinguishing features or other matters—all of which, when conjoined with a specification of ownership, are considered in this section. No doubt the more of these particulars the writing supplies the more likely, or certain, is the designation or description to be upheld as against statutory objection.

> "The specification of ownership, in most connections, is in itself an element of considerable weight, and with very little else has been held sufficient in many cases." Annot., 23 A.L.R. 6, 47–48 (1952).

Mrs. Kaplan, in her brief, points to *Klipfel v. Brandenburger*, 156 N.W.2d 774 (N.D. 1968), and relies on that case to support her argument that a memorandum, in order to take an oral contract out of the Statute of Frauds, must contain a more definite description of the property than is found here.

Other opinions of this court, both prior and subsequent to *Klipfel*, have stressed that in order to be sufficient, a memorandum need not be a complete contract in itself. *Johnson v. Auran, supra; Hoth v. Kahler, supra; Goetz v. Hubbell, supra.* On this basis, it has been held that the memorandum need only "intelligently identify the subject matter involved" and need not "necessarily use technical terms." *Goetz v. Hubbell, supra,* at 266 N.W. 838. It has been argued that Mrs. Kaplan and her late husband, Sig Gryttenholm, owned no land in North Dakota other than that involved in this case. Mrs. Kaplan has not disputed this argument, nor can we find evidence upon the record before us to dispute it. This feature alone distinguishes the instant case from *Klipfel*, where the purported sellers owned 880 acres, but sold only 640 acres without identifying the specific acres that were sold.

We believe that the trial court followed the correct law on this point, *Klipfel v. Brandenburger, supra,* being expressly overruled so far as it conflicts with this opinion. The court's finding "that the testimony of the parties, together with the letters introduced into evidence, intelligently identify the subject matter involved . . ." cannot be said to be clearly erroneous under the standard set forth in Rule 52(a), N.D.R. Civ.P., and is left undisturbed.

■ The final elements which a memorandum must show in order to take a contract out of the Statute of Frauds are the terms and conditions under which the contract was entered into. There are several letters in evidence subscribed by Sig Gryttenholm which, it is argued, show these terms and conditions. We think it necessary, for this purpose, to reprint only Defendant's Exhibit "B", a letter to one Burton Johnson:

> "Paramount, Calif
> "Sept 11, 1962

> "Dear Burton:
> "Am writing this letter to inquire whether you would still be interested in buying that farm of ours, in the event that Eddie Rohrich cannot make his payments this Fall.

> "Wrote to Eddie about a month ago, telling how much I expected to receive and told him to let me know whether he could make it or not. So far I've had nothing but silence from him.

"Two years ago, when we (my family & I) were home on a vacation I had several offers up to $13,000.00 for the property. However, I agreed to let Eddie have it for $12200.00 with a minimum of $5200.00 down and 1000.00 per year thereafter including taxes, insurance, & interest. He paid me 3000.00 about 1st of March 1961 & I was to have received the other 2200.00 a year ago this fall. Plus taxes, int & ins etc. Of course he didn't have it & I agreed to give him until this Fall (1962) to make the grade.

"Well as it happens now, I have an opportunity to buy some pretty valuable property down here at a reasonable price if I can come up with 14000.00 cash within 60 days. Must pay 2000.00 earnest money immediately in order to hold it & I don't like to do that unless I'm sure I can come up with the rest within the 60 days limit. I have enough equity in some other property here in Calif on which I can raise 2 or 3 thousand, but that will leave me short about 10 or 11 thousand, which sum I would have get from sale of farm in Steele.

"Eddies equity of 3000.00 has dwindled to less than 1500.00 due to taxes, insurance, & interest on unpaid balance, besides some other money he still owes me from previous years.

"Have been wondering whether you would care to take over the farm by paying me the difference in cash $10700.00. 12200.00 − 1500.00 (Eddies equity) & make an agreement with Eddie for him to buy the place from you if he is able, and then if he can't make it, you can just take over, and you will have the farm. I'm sick and tired of carrying those boys back there (he is not the only one who owes me) and I should like to get out from under.

"Now if you are interested, Burt, would you be able to call me by phone *collect*, to Metcalf 04236 some evening this week. I have to know as soon as possible, before I stick my neck out for the 2000.00 that I must pay now to hold the 60 day option.

"Greetings to you & your family.

"Sincerely
"(Please keep this letter)      Sig Gryttenholm
"(confidential, or I might)      13451 Brocklin
"(find myself in the dog)        Paramount
"(house               )          Calif"

Though this letter was introduced into evidence by Mrs. Kaplan, it clearly sets out the terms of the contract as argued by Mrs. Rohrich. Mr. Gryttenholm therein stated that he "agreed to let Eddie have it . . ." and set forth the consideration agreed upon, which concurs with the Finding of the trial court.

There is an argument that the offer was never accepted. This argument appears to be that no binding agreement was to be made until the full down payment had been made, and that such offer was revoked prior to acceptance, or, otherwise stated, that remittance of the down payment was a condition precedent to formation of the contract.

Mrs. Kaplan's testimony, under direct examination by her own attorney, was as follows:

"Q Was there ever any talk about entering a contract or a written contract?

"A Yes, as soon as the $5,200 downpayment was made we would have drawn up papers, which it never came to."

There was evidence to contradict this testimony. For example, Mrs. Rohrich, under direct examination by her attorney, stated that an oral contract was made in August of 1960. Evidence of such an agreement is present in the letter signed by Sig Gryttenholm and reprinted above, using the term "agreed", which implies mutual assent. In view of this evidence we cannot say that the trial court's findings as to the terms of the agreement are clearly erroneous.

In summary, we uphold the trial court's legal conclusion that the memorandum contained in the various letters is sufficient to support the existence of an oral contract (*See Johnson v. Auran, supra* at 652), and hold that no finding as to the terms of the contract is clearly erroneous under Rule 52(a), N.D.R.Civ.P.

Although the trial court also determined that part performance was sufficient to take the contract out of the Statute of Frauds, since the memorandum has served that purpose, the issue of part performance need not be reached.

Mrs. Kaplan contends that even if a binding contract was created in 1960, it was later rescinded. Language in several letters to the Rohrichs indicates that Mrs. Kaplan and her late husband, Mr. Gryttenholm, both considered the contract rescinded.

■ This, however, is not sufficient. Chapter 32–18, N.D.C.C., sets out a strict procedure for cancellation of a contract for the future conveyance of real estate. A notice of default must be served upon the defaulting party in the same manner as service of a summons in district court

(§§ 32–18–02, 32–18–03, N.D.C.C.), giving a statutory period of six months to a year to correct default (§ 32–18–04, N.D.C.C.). That chapter was not complied with here. Aside from bringing a court action, this is the only method of canceling a contract for deed. *Vail v. Evesmith*, 62 N.D. 99, 241 N.W. 719 (1932). *See* J. Leahy, *Cancellation of Land Contracts*, 32 N.Dak.L.Rev. 5 (1956). The argument made that the contract was rescinded, not canceled, is one of semantics. In this context, the words "cancel" and "rescind" are synonymous. *Black's Law Dictionary* 1471 (Revised 4th Ed. 1968).

We come now to Mrs. Kaplan's argument that even if a contract exists, is outside the Statute of Frauds, and was not rescinded, equity requires that specific performance be denied. In order to bring this argument into perspective, it is necessary to further develop the peculiar facts of this case.

It appears from the evidence that the land in question was purchased in 1949 by Elizabeth Kaplan and her husband at that time, Sig Gryttenholm, and held in joint tenancy. They lived on the land until they moved to California in 1955. Mrs. Kaplan testified that she discovered in 1957 that Edmund and Katherine Rohrich, her brother and sister-in-law, had moved onto the land. What happened from that time until the contract negotiations of 1960 is clouded by confusion, but it appears that no rent was paid during that interim by the Rohrichs for their use of the land.

Mrs. Rohrich testified that the contract made in August of 1960 called for a total purchase price of $12,200, to be paid as follows: $3,000 in December of 1960, $2,200 in the fall of 1961, and $1,000 each succeeding year until the balance was paid. She stated that the $1,000 yearly payments were to include taxes, interest, and insurance. The $3,000 payment was made early in 1961, but nothing was paid for some time thereafter. The evidence shows three letters to the Rohrichs from Sig Gryttenholm

during the year 1962, demanding payment. Mrs. Kaplan testified that, after Mr. Gryttenholm died in 1963, she wrote the Rohrichs several times, stating that the contract was at an end.

Mrs. Kaplan accepted $2,000 from the Rohrichs in 1969, which she maintains was in payment of rent, and which Mrs. Rohrich maintains was a payment on the contract. The Rohrichs paid off a note of Mrs. Kaplan's for $2,000 in 1971 and sent her a cashier's check for $1,000 in 1974. Again, there is dispute whether these payments were for rent or were payments under the contract.

The argument was made to this court that the delay in making payments could have been caused by speculative motives on the part of the Rohrichs. Whether a plaintiff who has been in default asks specific performance because of increased land values is a question to be considered by a court of equity. *See Raasch v. Goulet*, 57 N.D. 674, 223 N.W. 808, 815 (1929).[1]

Both Mrs. Kaplan and Mrs. Rohrich testified as to the violent nature of Edmund Rohrich, and referred to a statement by Mr. Rohrich that if someone else was allowed on the farm, they wouldn't walk off. Mrs. Kaplan also testified to an incident in 1963, when she came back to North Dakota to renegotiate the contract and was forced to return to California after Edmund Rohrich allegedly threatened to kill her. She stated that she did not take any action regarding the property because of threats by Edmund Rohrich toward anyone who would take over the land, and because her mother interceded on the Rohrichs' behalf. It is interesting that Mrs. Kaplan did serve a notice to quit upon Mrs. Rohrich on July 3, 1975, nine days after the death of Mr. Rohrich.

On the other hand, Mrs. Rohrich and her family lived on the land for nearly 15 years after the contract for sale was made without being asked to leave, a fact which a

---

1. Note that a portion of this case relating to the doctrine of substituted legal relief was expressly overruled in *Ziebarth v. Kalenze*, 238 N.W.2d 261, 266–267 (N.D.1976). The portions of *Raasch* referred to in this opinion do not relate to that doctrine and were not affected by our ruling in *Ziebarth*.

court could take into account in applying the equitable doctrines of laches and estoppel.

The allegations of threats by Edmund Rohrich and consequential fear by Mrs. Kaplan were referred to by the court, on the record, at the close of testimony:

"Now the defendant says that she did not do this because she was afraid, and we will accept that. The only thing is, it cannot be accepted in a legal sense. We can't and don't usually allow people to take the law into their own hands, and we don't, and that is why we have courts and that is why we have governments.

"There is no question these payments should have been made when they were due. There is no question that these payments were not made when they were due. As I said before, there is no question that the insurance was not kept up, the taxes were not paid, and they should have been. All of this adds up to a very serious default and the procedure is not too unwieldy to get rid of such a default. It could have been done early in the game. It could have been done in 1961, in 1962—it could have been done in any year, but it was never done. The defendant says the reason why it was never done was because she was afraid to. But, I am quite certain that had she done so she would have still not have had anything to fear because we have had situations like this before and they can be dealt with. What happened? Even as yet the defendant has not taken any action to cancel the contract and, as I said before, from the evidence I believe that there was a definite contract for the sale of land. She stated, however, that she accepted the payments that were made as rental payments—that was in her mind; in the mind of the plaintiff the payments were payments on the land, as she said."

■ Although counsel for Mrs. Rohrich asserts that the issue of equity is raised too late, as Mrs. Kaplan did not raise it at the trial level, we note that most of these allegations are set out in Mrs. Kaplan's Answer and Counterclaim. More importantly, counsel's argument ignores the principle that one who seeks specific performance has the burden of proving his entitlement thereto. *Syrup v. Pitcher*, 73 N.W.2d 140 (N.D.1955); *Kuntz v. Peters*, 286 Ky. 227, 150 S.W.2d 665 (1941).

This burden includes a showing of good faith on the part of the plaintiff:

"A court of equity, in the matter of specifically enforcing a contract to convey real estate, will insist on a showing of the utmost good faith on the part of the purchaser, and require that he make it appear that he has been ready, willing, able, and even eager throughout to have the contract enforced, and will refuse relief if, on account of his negligence or unwillingness at any time to perform his part, the performance has been delayed, especially if such delay renders performance inequitable and unjust as to the seller." *Raasch v. Goulet, supra*, at 808–809 (Syl. ¶ 4).

It is possible that the facts of this case could fit Section 32–04–13, N.D.C.C., which reads, in part:

"Specific performance cannot be enforced against a party to a contract in any of the following cases:

. . . . .

"2. If it is not as to him just and reasonable.

"3. If his assent was obtained by misrepresentation, concealment, circumvention, or unfair practice of any party to whom performance would become due under the contract, or by any promise of such party which has not been substantially fulfilled."

Whether specific performance would be just and reasonable as to Mrs. Kaplan, or whether the promise of the Rohrichs' has not been substantially fulfilled, are factual questions to be considered by a court of equity.

■ We have recently commented on our role in such a case:

"Specific performance, an equitable remedy, is neither a matter of grace nor of absolute right. . . . Where the

court exercised its discretion after weighing the equities of the case, we do not interfere in the absence of a showing that discretion was abused. . . ." *Zimmerman v. Campbell*, 245 N.W.2d 469, 471 (N.D.1976).

■ The purpose of the requirement of Rule 52(a), N.D.R.Civ.P., that the trial court "find the facts specially" is that the appellate court have a correct understanding of the factual issues which the trial court used as a basis for the Conclusions of Law and Judgment thereon. *DeForest v. DeForest*, 228 N.W.2d 919, 924 (N.D.1975); *Ellendale Farmers Union Cooperative Ass'n v. Davis*, 219 N.W.2d 829, 836 (N.D.1974); 9 Wright & Miller, Federal Practice and Procedure: Civil § 2582 (1971).

■ In light of the trial court's comments, *supra*, on the record, in announcing his decision and, more appropriately, because the wording of his Finding of Fact "That the Plaintiff is *entitled* to specific performance of the contract of August 1960" (emphasis added), we conclude that the court did "find the facts specially".[2]

■ We likewise conclude that there is no showing of abuse of discretion in the trial court's finding that Mrs. Rohrich is entitled to specific performance. *Zimmerman v. Campbell, supra.*

For the reasons stated in this opinion, the judgment is affirmed.

VOGEL, PEDERSON, PAULSON and SAND, JJ., concur.

[2] We do feel, however, that had the Findings of Fact and Conclusions of Law more clearly shown the factual issues considered by the trial court and the legal principles applied, it could have made the task of appellate review less difficult.