Dolores High JOHNSON, Plaintiff/Appellee,

v.

Richard W. AURAN and Auran Chevrolet
Company, Defendants/Appellants.

Civ. No. 8908.

Supreme Court of North Dakota.

Feb. 1, 1974.

Bosard, McCutcheon, Kerian, Schmidt & Holum, Minot, for plaintiff/appellee.

Farhart, Rasmuson & Olson, Minot, for defendants/appellants.

ERICKSTAD, Chief Justice.

This is an appeal by Richard W. Auran and the Auran Chevrolet Company of Min-

ot from the order of the District Court for the Fifth Judicial District, Ward County, denying their motion for judgment notwithstanding the verdict or in the alternative for a new trial, and from the judgment rendered against them. During the pendency of this appeal Mr. Auran died, and, by stipulation of the parties, the First National Bank in Minot, the duly appointed administrator of his estate, has been substituted as a party defendant-appellant.

The judgment and orders appealed from arose out of a civil action instituted by Dolores High Johnson against Richard W. Auran and Auran Chevrolet Company for specific performance of, or damages for a breach of, an alleged contract in which Mr. Auran and Auran Chevrolet were to furnish Mrs. Johnson with $100 a month for five years and the use of a new car yearly for the balance of her natural life.

In the fall of 1965, Mrs. Johnson's husband, Carmen Johnson, was the owner of Johnson Chevrolet located in Minot, North Dakota. However, all of the Class A common stock and a majority of the preferred stock in that company were owned by Motors Holding Division of General Motors Corporation (hereinafter Motors Holding).

On September 22, 1965, Carmen Johnson died and shortly thereafter Mrs. Johnson consulted Bruce Van Sickle, a Minot attorney, concerning the sale of the automobile business and the probate of her husband's estate.

One problem that complicated the sale was that Mrs. Johnson wanted the purchaser to provide for her use a new car yearly. Mr. Van Sickle's testimony with respect thereto follows:

"Q. Would you please tell the jury about the problems in the sale?

\* \* \* \* \* \*

"A. \* \* \* This was not a trouble, but very early Mrs. Johnson pointed out to me that she knew of the fact that her mother-in-law, I believe, who was also the widow of a Chevrolet dealer, had received a car for her natural life as the widow of a selling dealer, and she too desired to have the same benefit so that became a factor in attempting to find a purchaser. And interposed on top of that was the fact that the General Motors' people refused to participate in the purchase unless the purchase contract was held within the terms of their proposed contract, and they very definitely did not, would not, accede to a program which allowed Mrs. Johnson to acquire more than the amount recited in the contract. They would not concern themselves with anything over and above what was recited in the contract. Yet for my client, it was necessary for me to get what I could. This was what she desired."

On or about December 3, 1965, at a meeting attended by Mr. Van Sickle, Mr. Auran, and possibly Mr. Boos and Mr. Marco, the latter two persons representing Motors Holding, Mr. Auran submitted a written offer to purchase Johnson Chevrolet (hereinafter referred to as Exhibit No. 5). Exhibit No. 5 is a letter from Mr. Auran to Motors Holding and Mrs. Johnson, as administratrix of the estate of Carmen L. Johnson, to which is attached a proposed agreement.

In the letter Mr. Auran offered to purchase all of the common and preferred stock held by Motors Holding and the estate of Carmen L. Johnson. The common stock was to be purchased at book value as of November 30, 1965, and the preferred stock was to be purchased at par value plus accrued but unpaid interest as of November 30, 1965. This represented all of the stock of Johnson's Chevrolet. In the letter he also offered to purchase a 6% longterm note of Johnson Chevrolet held by Motors Holding for the unpaid balance of the note, and to deposit $30,000 as security for his performance of the contract.

Mr. Van Sickle testified relative to this meeting as follows:

"A. * * * If the Court please, the previous incident was that the Motors Holding people had made clear they would not accept anything outside of their contract. My concern was to get everything I could for my client. When the gentlemen came in, I had the file open in front of me, and my recollection is that the offer was presented to me, printed up, or typed up, as you will receive it, and I said something about the car matter. It was pointed out it was not a matter that General Motors people would consider or countenance. It could not be raised there. It was dropped and taken up between Mr. Auran and myself at a later time. It was not included in their settlement. It was not discussed any more in front of the General Motors' people. That is the transaction."

Mr. Auran testified relative to the use of a new car yearly as follows:

"Q. And was there any conversation as to furnishing Mrs. Dolores High Johnson, the Administratrix, with an automobile for the rest of her life on December 3, 1965, now at Bruce Van Sickle's office?

"A. I heard no conversation of this nature at that time, and I certainly did not take part in any conversation on that matter."

Following the meeting duplicate originals of Exhibit No. 5 were delivered to Mrs. Johnson. Mrs. Johnson's signature appears at the bottom of the letter as accepting the offer as the administratrix of the estate as of December 3, 1965.

Apparently in response to a written offer submitted by Mr. Van Sickle on behalf of Mrs. Johnson to Mr. Auran, Mr. Auran submitted a counter offer relative to the use of a new car yearly. This offer we shall hereinafter refer to as Exhibit B.

Mr. Van Sickle testified relative thereto as follows:

"Q. * * * Would you please then disclose to the jury, Mr. Van Sickle, the contents of that discussion that occurred with Mr. Auran?

"A. Yes, sir. On December 3 the option, or the offer, had been tendered, and accepted by Mrs. Johnson. Between that time and January 12, is the time of the occurrence of this memorandum. December 22, 21? Sometime before December 21. Whether a day or a matter of hours, I don't know, but I prepared a letter, a simple recital, drawing it in accordance with the North Dakota Statute, and by the language of that recital, Mr. Auran was to furnish an automobile to Mrs. Johnson for the rest of her natural life. I delivered that to Mr. Auran. Mr. Auran took it out of my office. He returned later, not with the instrument that I prepared, but with an instrument that someone else had prepared, and he advised me at that time that this, the memorandum of December 21, was the only thing that he would be willing to execute, and he explained that the reason it was the only thing, that it would be the only thing he would be willing to execute, his tax adviser informed him he could not execute the instrument I had drawn. I then took that instrument to Mrs. Johnson and explained to her reasons why she should accept the instrument. Incidentally, at the time of the conversation, he said—at the time of the conversation—'You may be sure Mrs. Johnson will receive her car,' or words to that effect, 'I will keep my part.' I took that to Mrs. Johnson and explained to Mrs. Johnson

I had advised Mr. Auran he had acted with honor in the transaction. I had no reason to believe except that he would, and that we were getting—this was more than the commitment in the sale, that we should take what we could get. She needed everything I could get for her and recommended to her that she should proceed under that memorandum. She did so, and it was distributed at the time of the execution of the instruments on January 12. That memorandum was passed over to Mr. Gimse who was collecting the papers and proceedings with them."

Exhibit B reads:

"December 21, 1965

"Mrs. Carmen L. Johnson
41 Country Club Acres
Minot, North Dakota

"Dear Madam:

"Because of the fine manner in which we have worked out our settlement in regard to the sale of your interest in the Johnson Chevrolet Company and because I believe it will be to the interest and benefit of the Auran Chevrolet Company I ask you to accept employment as a goodwill representative of the Auran Chevrolet Company at a salary of $100.-00 per month, operating from your home, for a period which I estimate not to exceed five years. In connection with this I also feel it would be to the interest and benefit of the Auran Chevrolet Company to furnish you with a new car yearly, for your use, to be registered in your name, appropriate physical damage and liability insurance to be paid for by you, while you shall be the principal driver, which I assume will be for the most of the rest of your natural life, and while, in my opinion, it shall be to the interest and benefit of the Auran Chevrolet Company. The above shall be suspended during any period of war, strike, natural disaster etc. when new car shipments or sales are curtailed.

"Yours truly,

S/ Richard W. Auran
"Richard W. Auran"

At the January 12 meeting referred to by Mr. Van Sickle, Mr. Auran, Motors Holding, and Mrs. Johnson, as administratrix for the estate of Carmen L. Johnson, in accordance with the December 3 offer and acceptance, executed a formal contract (hereinafter referred to as Exhibit No. 6) for the sale of Johnson Chevrolet. This contract contained no provision for the use of a new car yearly.

Mr. Van Sickle further testified concerning this meeting as follows:

"Q. Yes, yes. When you speak of the sale of Johnson Chevrolet Company, stock, there were only two owners of the stock on December 3 and on January 12, 1966, that is Motors Holding Company and Carmen L. Johnson Estate?

"A. Yes, sir, I believe that's correct.

"Q. And Mrs. Dolores High Johnson had been appointed the administratrix of this particular estate?

"A. Yes, she was. She was an agent for the estate. She wasn't a principal in this sale.

"Q. That's right, and she did not individually sell any stock that she owned, did she?

"A. My recollection, no."

Mrs. Johnson testified that Mr. Auran provided her with a new car annually, either in the late fall or early spring (November-April), from 1966 through 1970.

She also testified as follows concerning her arrangement with Mr. Auran during that period.

"Q. Mrs. Johnson, were you aware of any employment stipulations or re-

quirements of you at this time? Now at the time you got your first two cars, any employment stipulations that were required of you by Auran Chevrolet?

"A. We had an agreement that I would receive $100.00 per month for any services that I may be called on to perform. He said it could be clerical work, or whatever he may ask of me, and always as a goodwill representative, which going out to the Base in the new car created.

"Q. Was there a limitation of time as to how long you were to receive this $100.00 per month?

"A. Until my youngest child was in school, which would be five years.

"Q. What was the basis of the $100.00 per month payment as to a period of time? You mentioned the youngest child being in school?

"A. Yes, sir.

"Q. How old was the youngest child when you received the first $100.00 per month payment?

"A. One.

"Q. He would have been in school about five years later?

"A. Yes.

"Q. Did you receive these $100.00 a month payments for the five-year period?

"A. Yes, I did.

\*     \*     \*     \*     \*     \*

"Q. What acts of goodwill, as a representative of the company, did you do when you mentioned at the Air Force Base you had the car? Would you please explain that to the jury more thoroughly?

"A. Well, people at the Air Force Base are very interested in automobiles, and we talked a lot, and I've been raised in a Chevrolet family, and I talked up Chevrolets. Also they were very interested in any car I was driving, and asked me all kinds of information about it. When I was ready to trade it in, turn it in, they would inquire who to see, to go and inquire at the business about the price of it.

"Q. And was anything further requested of you in the form of employment, or that of being a goodwill representative of Auran Chevrolet, by Mr. Auran, himself?

"A. No, it was not.

"Q. Was that true for the entire length of time that you were paid this $100.00 a month?

"A. That's correct."

In January of 1969 Mrs. Johnson was contemplating moving to Florida. She testified as follows concerning the discussion of this move with Mr. Auran:

"Q. Do you remember discussing this with Mr. Auran?

"A. Yes, I do.

"Q. And did you tell Mr. Auran where you planned on moving to?

"A. Yes. I was considering moving. \* \* \* I decided to move to Florida and was considering this move, so I went in to see Mr. Auran and asked him if it made any difference in our arrangements on this car for the rest of my life if I'd leave the state. He said it wouldn't matter at all, except I would have to bring the car back to pick up the next model, and there may be a difference in license plates; that he wouldn't be able to furnish any license plates in Florida, and he asked me to pay for the additional equipment."

Mr. Auran's testimony concerning the same discussion was as follows:

"Q. And do you remember the substance of this conversation between you and Mrs. Dolores Johnson?

"A. Yes, I do.

"Q. Would you state the substance of that conversation as you remember?

"A. We had some small talk probably and she informed me she was planning to move from Minot. She hadn't substantiated her plans yet, but she was making plans to move, and she asked me for a—for permission to take the car with her, and I granted her that permission, and I saw no reason at that time to change our arrangement."

Mrs. Johnson moved to Florida in July of 1969. In December of that year, two of her sons returned to Minot where they received the fifth automobile from Mr. Auran and returned the fourth one.

In December of 1970, Mr. Auran contacted Mrs. Johnson by telephone. Mrs. Johnson's testimony with respect to that conversation follows:

"Q. And do you recall a telephone conversation you had with Mr. Auran in December of 1970?

"A. Yes.

"Q. Do you remember the approximate date of that telephone conversation that was had between yourself and Mr. Auran?

"A. Just a few days—a couple of days before Christmas.

"Q. What day, approximately?

"A. Approximately the 20th.

"Q. Who initiated the telephone call?

"A. Mr. Auran called me.

"Q. And what is it he said to you first?

"A. He said he decided that he no longer felt like I should have a car and please return it at once to Minot.

"Q. And what did you say in response to that?

"A. I was amazed. I couldn't really believe that he meant that.

"MR. FARHART: Excuse me, I move to strike the answer, Your Honor, as not being responsive.

"THE COURT: Sustained. He's asking for the conversation. Not what was in your mind. (To Mrs. Johnson)

"Q. (By Mr. Schmidt, continuing) What did you say to Mr. Auran in response to that statement you just told the jury about, what did you say?

"A. I don't remember exactly. I remember just saying, 'Do you really mean this'? I was trying to believe it in my mind, and I asked him these types of questions. I don't remember the exact words."

Mrs. Johnson testified that on March 19, 1971, G.M.A.C. repossessed the car she had been driving since December of 1969. She thereafter commenced this action against Richard Auran and Auran Chevrolet seeking specific performance of an alleged contract to provide a new car yearly or for damages in the sum of $30,400 for breach of the alleged contract. When all the evidence had been submitted Mr. Auran moved for a directed verdict. The motion was denied and the jury returned a verdict for Mrs. Johnson in the sum of $12,500 with interest and costs. Mr. Auran then moved for a judgment notwithstanding the verdict or in the alternative for a new trial. The motion was denied and judgment was entered in accordance with the verdict.

Hereinafter, in discussing the arguments presented to this court, the defendants and appellants, Auran Chevrolet and First Na-

tional Bank in Minot, as administrator of the estate of Richard W. Auran, will be referred to as Auran, and Mrs. Johnson will be referred to as Johnson.

As stated by Auran, the issues on appeal are:

1) Was there sufficient evidence of an oral agreement to sustain the verdict?

2) If there was an oral agreement, was said oral agreement void by virtue of the Statute of Frauds?

3) Did the court err in allowing parol evidence to be introduced to vary the terms of Exhibit B?

4) Did the court err in allowing parol evidence to vary the terms of the written contracts, Exhibits 5 and 6?

5) Did the court err in not dismissing plaintiff's cause of action in that the alleged agreement was based on "goodwill" which by law passed prior to the alleged oral agreement?

6) Was plaintiff's cause of action, by law, in violation of a fiduciary relationship held by plaintiff, and if so, did the court err in failing to grant defendants' motion to dismiss her cause of action?

7) Did the court err in submitting defendants' counterclaim to the jury when the evidence shows that defendants had established their counterclaim against plaintiff?

Because an oral agreement may be void by virtue of the Statute of Frauds, we shall first determine whether the Statute of Frauds is applicable in the instant case.

The pertinent statute reads:

"9–06–04. * * * The following contracts are invalid, unless the same or some note or memorandum thereof is in writing and subscribed by the party to be charged, or by his agent:

"1. An agreement that by its terms is not to be performed within a year from the making thereof;" N.D.C.C.

The trial court determined after considerable discussion in chambers that the Statute of Frauds was not applicable. It is not clear from the record how the trial court concluded that the Statute of Frauds was inapplicable.

In Heinzeroth v. Bentz, 116 N.W.2d 611 (N.D.1962), a quiet title action involving subsection 4 of the Statute of Frauds, this court found the Statute of Frauds applicable and affirmed the trial court's judgment, although it expressed doubts as to the reasoning applied by the trial court in reaching its conclusions of law upon which the decision was based.

"In this case, the trial court found for the plaintiffs for reasons we do not believe are entirely valid. Where the trial court's conclusion is correct, it will not be disturbed merely because the court gives an incorrect or insufficient reason for its decision." Heinzeroth v. Bentz, *supra*, 116 N.W.2d 611 at 616.

See also Damm v. National Insurance Company of America, 200 N.W.2d 616 at 620 (N.D.1972).

■ We think it follows that we may likewise sustain a ruling made during a jury trial on an issue of law, even though the reasoning given by the trial court for the ruling may not support the ruling or may even be incorrect, if in fact the ruling is correct for some other good reason.

The answer to whether there is a sufficient legal basis upon which the trial court could have correctly concluded that the Statute of Frauds was inapplicable depends upon (1) whether there existed a sufficient memorandum in writing signed by the party to be charged and (2) whether the determination of the sufficiency of the memorandum was a question of law to be decided by the trial judge or a question of fact to be decided by the jury.

Cases which have considered the first question seem to hold that the memo to be sufficient must contain all the essential or

material conditions and terms of the contract.

In Hoth v. Kahler, 74 N.W.2d 440 (N. D.1956), the court considered an alleged contract for the sale of realty. The court analyzed various correspondence, telegrams and other communication between the plaintiff and defendant. The defendant contended that such correspondence was not a sufficient note or memorandum under the Statute of Frauds. The court cited Goetz v. Hubbell, 66 N.D. 491, 266 N.W. 836, 838 (1936), in support of its finding that such communication was sufficient under the Statute of Frauds. The holding in *Goetz* is embodied in Syllabus ¶ 1 in *Hoth*.

"1. Under the statute of frauds an agreement for the sale of real property is invalid unless the same or some note or memorandum thereof is in writing subscribed by the party against whom it is sought to be enforced; but such memorandum need not be a complete contract in itself, but may consist of several documents, letters or telegrams, *provided these documents show who are the contracting parties, intelligently identify the subject matter involved, express the consideration and disclose the terms and conditions upon which the contract is entered into.*" Hoth v. Kahler, *supra,* 74 N.W.2d 440 at 441. [Emphasis added.]

In *Heinzeroth* the issue was whether a deed signed by plaintiffs and delivered to an escrow agent was a sufficient memorandum of an oral contract to satisfy the Statute of Frauds. In concluding that it was not a sufficient memorandum this court said:

"Here, all of the terms of the oral agreement are set forth in the deed except the consideration. The deed does express a consideration, but not the real consideration. The fact that the consideration cannot be determined from the writing which is relied upon as a memorandum, without resort to outside evidence, renders the writing insufficient as

a memorandum to take the transaction out of the statute of frauds." Heinzeroth v. Bentz, *supra,* 116 N.W.2d 611 at 615.

See also Heinrich v. Martin, 134 N.W.2d 786 (N.D.1965); Hagen v. Schluchter, 126 N.W.2d 899 (N.D.1964); and Hartman v. McNamara, 186 F.Supp. 293 (D.C.N.D. 1960), which rely upon the above-stated standards in determining the sufficiency of a memorandum when dealing with transfer or sale of real property. We conclude such standards are applicable to the situation at bar involving a written memorandum of an alleged oral contract not to be performed within a year from the making thereof.

Having determined what standards are applicable, we must now decide whether Exhibit B was a sufficient memorandum to take the agreement outside the Statute of Frauds.

Exhibit B reads:

"December 21, 1965

"Mrs. Carmen L. Johnson
41 Country Club Acres
Minot, North Dakota

"Dear Madam:

"Because of the fine manner in which we have worked out our settlement in regard to the sale of your interest in the Johnson Chevrolet Company and because I believe it will be to the interest and benefit of the Auran Chevrolet Company I ask you to accept employment as a goodwill representative of the Auran Chevrolet Company at a salary of $100.-00 per month, operating from your home, for a period which I estimate not to exceed five years. In connection with this I also feel it would be to the interest and benefit of the Auran Chevrolet Company to furnish you with a new car yearly, for your use, to be registered in your name, appropriate physical damage and liability insurance to be paid for by you, while you shall be the principal driver, which I assume will be for the most of

the rest of your natural life, and while, in my opinion, it shall be to the interest and benefit of the Auran Chevrolet Company. The above shall be suspended during any period of war, strike, natural disaster, etc. when new car shipments or sales are curtailed.

"Yours truly,

S/ Richard W. Auran

"Richard W. Auran"

■ On the face of Exhibit B we must be able to determine:

1) Who the contracting parties are;

2) The identity of the subject matter involved;

3) The consideration;

4) The terms and conditions upon which the contract was entered into.

Syllabus ¶ 1, Hoth v. Kahler, *supra,* 74 N.W.2d 440 at 441.

1) The contracting parties appear to be Mrs. Carmen L. Johnson and Richard W. Auran;

2) The subject matter of the contract for the purposes of this action is "a new car yearly";

3) The consideration is the acceptance of employment as a goodwill representative of Auran Chevrolet for "I estimate not to exceed five years" in exchange for "$100.00 per month" and the use of "a new car yearly" for "five years" or in exchange for the use of a new car yearly for "the most of the rest of your natural life" or in exchange for the use of a new car yearly "while you shall be the principal driver, which I assume will be for the most of the rest of your natural life" or in exchange for the use of a new car yearly "while, in my opinion, it shall be to the interest and benefit of the Auran Chevrolet Company";

4) The terms and conditions of the contract were that Johnson was to operate from her home, the new car was to be registered in Johnson's name, Johnson was to pay for physical damage and liability insurance, and Johnson was to remain the principal driver. A further condition was that the agreement was to be suspended "during any period of war, strike, natural disaster, etc., when new car shipments or sales are curtailed."

■ We therefore determine that Exhibit B contains all the essential conditions of a contract. What the contract means is another question. Because the memorandum contains the essential conditions of a contract, it is not within the Statute of Frauds notwithstanding it may be ambiguous. As we shall see later, parol testimony may be received to explain an ambiguous memorandum. Having determined the memorandum is sufficient under North Dakota law to take the agreement out of the Statute of Frauds, we next turn to the second question, whether the determination of the sufficiency of the memorandum was a question of fact or of law.

This court has never passed directly upon the question of whether the determination of the sufficiency of a memorandum is a question of fact or of law. We, therefore, will look to other jurisdictions which have considered such a question.

In Waller v. Tootle-Campbell Dry Goods Co., 59 S.W.2d 751 (Mo.App.1933), the Kansas City Court of Appeals had before it an action to recover damages for an alleged breach of an oral contract of employment. A letter was written to plaintiff-employee and signed by the defendant-employer. This letter was asserted to be a sufficient memorandum of the contract of employment to take the agreement out of the Statute of Frauds. Although the court determined the letter to be insufficient as a memorandum, it held the sufficiency of the letter was a question of law for it to decide.

"The sufficiency of the letter of December 26, 1929, as a memorandum of a contract of employment for one year to commence January 1, 1930, was for the

court to determine as a matter of law." Waller v. Tootle-Campbell, *supra*, 59 S. W.2d 751 at 754.

In Burnett v. Mar-Tex. Realization Corp., 250 S.W.2d 612 (Tex.Civ.App.1952), Mar-Tex. Corporation brought an action against Burnett to compel delivery of an oil and gas lease which contained a drilling contract covering a certain tract of land. The jury rendered a verdict for Mar-Tex., whereupon Burnett appealed alleging that the contract did not satisfy the Statute of Frauds. The court of appeals held that the determination of whether the memorandum was sufficient was a question of law.

"The question of whether there was a sufficient written memorandum to show an oral contract to make a lease is a question of law and not one of fact. [Citing cases.]" Burnett v. Mar-Tex., *supra*, 250 S.W.2d 612 at 616.

In J. E. Seagram & Sons, Inc. v. Shaffer, 310 F.2d 668 (10 Cir. 1962), the jury returned a verdict for Shaffer on a counterclaim against Seagram & Sons based upon an alleged oral contract to purchase corporate stock. Seagram & Sons appealed claiming that the writings relied upon by Shaffer were insufficient to establish an oral contract giving Shaffer an option to purchase corporate stock sufficient to satisfy the requirements of the Oklahoma Statute of Frauds.

In finding the writings insufficient, the court of appeals said:

"The question of whether the memoranda, letters or other writings relied upon are sufficient to constitute a contract or agreement which meets the requirements of the statute is one for the court to determine as a matter of law." J. E. Seagram & Sons, Inc. v. Shaffer, *supra*, 310 F.2d 668 at 675.

Another case involving the sufficiency of a memorandum is Ray Motor Lodge, Inc. v. Shatz, 80 Nev. 114, 390 P.2d 42 (1964). There the Nevada supreme court said:

"Of course whether the 'writing' required by the statute is legally sufficient presents a question of law." Ray Motor Lodge, Inc. v. Shatz, *supra*, 390 P.2d 42 at 44.

■ It is our conclusion that the sufficiency of a memorandum to constitute a contract which meets the requirements of the Statute of Frauds is a question for the court to determine as a matter of law.

Accordingly, the decision of the trial court denying Auran an instruction on the Statute of Frauds was correct, since Exhibit B was a sufficient memorandum of an oral contract to take the agreement out of the Statute of Frauds.

The third specification of error asserts that the court erred in allowing parol evidence to be introduced to vary the terms of Exhibit B. Auran relies upon Hanes v. Mitchell, 78 N.D. 341, 49 N.W.2d 606 (1951), quoting the syllabus:

"3. Where a written contract is complete, clear and unambiguous and contains mutual and contractual covenants, or the consideration consists of a specific, direct promise to do or not to do certain things, its provisions cannot be changed by parol in the absence of fraud, misconduct or accident."

The trial judge admitted the parol testimony of Mr. Van Sickle, Mrs. Johnson, and Mr. Auran, not to change or modify Exhibit B, but to explain what he determined to be an ambiguous memorandum.

From the possible meanings of Exhibit B earlier alluded to on page [14] herein, it is obvious that we agree with the trial court in its conclusion.

■ The determination of the existence of an ambiguity in a contract is a question of law. Stetson v. Investors Oil, Inc., 140 N.W.2d 349 (N.D.1966); Berry v. Heinz, 139 N.W.2d 145 (N.D.1965). In a more

recent decision we held that whether an ambiguity exists in a will is a question of law for the court to determine. Estate of Bennie O. Johnson, 214 N.W.2d 109 (N.D. 1973). We conclude that whether an ambiguity existed in the memorandum was a question of law for the trial court to decide.

On its face Exhibit B states all essential elements of a contract, but the stated consideration is susceptible of at least four possible interpretations. The "new car yearly" in exchange for Johnson's "goodwill employment" is to continue for only "five years", or for "the most of the rest of your [Johnson's] natural life", or for as long as Johnson is the principal driver, or only as long as Auran determines it is in the best interests of Auran Chevrolet. Arguments can be made for each of these contrary positions.

As we said in Estate of Bennie O. Johnson, *supra*, in the Syllabus:

"2. When good arguments can be made for either of two contrary positions as to the meaning of a term in a document, an ambiguity exists."

Having determined the lower court correctly construed Exhibit B as ambiguous, did the court err in allowing parol evidence to be introduced? Auran maintains the parol evidence was admitted to vary the terms of Exhibit B. Johnson maintains the parol evidence was admitted to explain the existing terms of Exhibit B, not to vary or supply new terms or conditions.

In Goetz v. Hubbell, 66 N.D. 491, 266 N.W. 836 (1936), the question of whether parol evidence can be admitted to explain a memorandum is directly considered. The court there said it is uniformly held whether construing a memorandum under the Statute of Frauds or a written contract that parol evidence may not be introduced to vary terms of the memorandum or contract, but may be introduced to explain and make certain.

"3. Such memorandum need not be a complete contract in itself. It is the written evidence of the contract, and while parol evidence may not be introduced to vary the terms of such memorandum, nevertheless parol evidence may be introduced to explain the same and make it certain." Goetz v. Hubbell, *supra*, 266 N.W. 836, Syllabus ¶ 3.

A review of subsequent cases shows that this court has not deviated from this principle.

In Hoth v. Kahler, *supra*, 74 N.W.2d 440, the *Goetz* case was followed and quoted extensively. In Heinzeroth v. Bentz, *supra*, 116 N.W.2d 611, it is stated that all essential elements must be present and cannot be supplied by parol.

"An agreement or memorandum of sale of real estate may not, however, be partly in writing and partly in parol. The essential terms must be in writing." Heinzeroth v. Bentz, *supra*, 116 N.W.2d 611 at 614.

This is consistent with our approach to the case at bar, since all essential terms are in writing nothing new is being supplied. Parol evidence is used to explain existing essential terms.

In Hagen v. Schluchter, 126 N.W.2d 899 (N.D.1964), there is no dilution of the principle set forth in *Goetz*. The case merely restates an old principle that "A memorandum, sufficient to satisfy the statute of frauds, must contain all of the essential or material conditions and terms of the contract." Hagen v. Schluchter, *supra*, 126 N.W.2d 899 at 902.

Other North Dakota cases dealing with the Statute of Frauds are concerned with different aspects of the Statute than concern us in the case at bar. They do not change the principle stated in *Goetz*. See Buettner v. Nostdahl, 204 N.W.2d 187 (N.D.1973); North American Pump Corp. v. Clay Equipment Corp., 199 N.W.2d 888 (N.D.1972); Rieger v. Rieger, 175 N.W.2d 563 (N.D.1970); Tostenson v. Ihland, 147

N.W.2d 104 (N.D.1966); Keen v. Larson, 132 N.W.2d 350 (N.D.1964).

We have reviewed the parol evidence which was admitted and conclude that such evidence did not add to or vary the terms of Exhibit B; rather, it attempted to explain and make certain the existing ambiguous terms of Exhibit B by referring to circumstances under which it was made. The meaning of the memorandum in light of the oral testimony was a question of fact for the jury.

We shall next consider specification of error No. 1, that the evidence is insufficient to sustain the verdict. Auran has appealed from the judgment and from the order denying the defendant's motion for judgment notwithstanding the verdict or in the alternative for a new trial.

In Lembke v. Unke, 171 N.W.2d 837 (N.D.1969), a will contest tried to a jury, we said that on an appeal from a judgment rendered on a verdict or from an order denying a motion for judgment notwithstanding the verdict or in the alternative for a new trial, in determining the sufficiency of the evidence to sustain the verdict of the jury, the evidence must be viewed in the light most favorable to the verdict. *Lembke, supra,* Syllabus ¶ 6. See also North American Pump Corp. v. Clay Equipment Corp., 199 N.W.2d 888 (N.D.1972), and Farmers Union Grain Terminal Ass'n v. Briese, 192 N.W.2d 170 (N.D.1971).

It was further determined in *Lembke* that the credibility of the witnesses and the weight to be given their testimony are questions of fact for the jury to determine. See Syllabus ¶ 7.

A review of the evidence when considered under the standards set forth herein leads us to the conclusion that the evidence sustains the verdict.

Johnson called five witnesses to testify on her behalf. Mr. Bruce Van Sickle, her former attorney and now Judge of the United States District Court for the District of North Dakota, and Dolores Johnson herself testified as to the existence and substance of the agreement between Auran and Johnson. The testimony of Mr. J. H. Hoevan, a Minot banker, Professor Agnes Ladendorf, Chairman of the Mathematics Department at Minot State College, and Mr. Auran, who was called for cross-examination, dealt with the amount of Johnson's loss and the computation of damages.

Reviewing the testimony of Judge Van Sickle, the jury could have found that attorney Van Sickle represented Johnson in the probate of her husband's estate and represented the estate in the sale of Johnson Chevrolet to Auran; that attorney Van Sickle also represented Johnson in her individual capacity in negotiations with Auran for the use of a new car annually for life and for $100 a month for a five-year period; that attorney Van Sickle and Auran discussed the new car Johnson was to receive yearly for life and the $100 a month for a five-year period several times between December 3, 1965, and December 21, 1965, when Exhibit B was signed; that attorney Van Sickle drafted an instrument on December 21, 1965, which contained an agreement to furnish Johnson with a new car yearly for the rest of her life, but that Auran told attorney Van Sickle that his tax adviser had informed him he could not execute the instrument that attorney Van Sickle had drawn; that instead Auran drafted a letter dated December 21, 1965, and personally delivered it to attorney Van Sickle; that this letter was Exhibit B and from this letter the jury could have determined Johnson was to receive the use of a new car yearly for the rest of her natural life.

From the testimony of Johnson the jury could have found that she consented to act in reliance upon and in accordance with Exhibit B; that in so acting she promoted goodwill customer relations for Auran Chevrolet; and that the agreement with Auran was not dependent upon Johnson residing in Minot, North Dakota.

Our review of the testimony of Van Sickle and Johnson leads us to the conclusion that the evidence was sufficient to sustain a verdict for Johnson. We have also considered the testimony of the other witnesses relating to the amount of the verdict. The testimony was presented in a manner which asked the jury to return a verdict in an amount which, if deposited in a savings account and considering the interest to be earned over the years, would be sufficient to allow Johnson to withdraw yearly for the rest of her expected life the amount of damages it was determined Auran had caused her to suffer on a yearly basis. Professor Ladendorf testified that Johnson suffered a total present loss of $27,203.40, assuming a yearly loss of $1,700 for the remaining 33 years of Johnson's life, discounted by 5% annually. The $1,700 yearly figure as the value of the yearly use of the type of car provided by Auran to Johnson was supported by other testimony of Auran and stipulations of counsel. The jury returned a verdict of $12,500, an amount well within the $27,203.40.

Auran next contends in specification of error No. 4 that the trial court erred in allowing parol evidence to vary the terms of the written contracts involving Auran's initial offer to purchase Johnson Chevrolet and the final purchase agreement between Motors Holding, Johnson as the administratrix of the estate of her deceased husband, and Auran—Exhibits 5 and 6 respectively. Exhibit 5, the offer to purchase, was accepted by Johnson as the administratrix of the estate on December 3, 1965. Exhibit B, the memorandum of the oral agreement between Auran and Johnson, was executed on December 21, 1965; and Exhibit 6, the formal purchase contract, was executed by all parties on January 12, 1966.

Auran cites Section 9–06–07, N.D.C.C., in support of his contention:

"The execution of a contract in writing, whether the law requires it to be written or not, supersedes all the oral negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument."

In Putnam v. Dickinson, 142 N.W.2d 111 (N.D.1966), an action to enjoin defendants from selling property contended by plaintiffs (purchasers) to be dedicated to park purposes, we affirmed the trial court's admission of oral evidence to show that defendants had orally agreed to maintain as a park certain land near property sold by defendants to plaintiffs when the deed to the plaintiffs did not make reference thereto.

In *Putnam* we said:

"1. Section 9–06–07, N.D.C.C., does not preclude proof of the existence of any separate oral stipulation or agreement as to any matter on which the written contract is silent, and which is not inconsistent with its terms, if from the circumstances of the case the court infers that the parties did not intend the document to be a complete and final statement of the whole of the transaction between them." Syllabus ¶ 1, Putnam v. Dickinson, *supra*, 142 N.W.2d 111 at 113.

The essential fact situation in *Putnam* differs from the case at bar in that *Putnam* involved one agreement and one consideration in which no mention was made of a certain feature of the agreement, that of maintaining adjoining land for park purposes, whereas the case at bar concerns two separate contracts and two separate considerations. Despite the difference in the factual situations, we conclude the principle in *Putnam* is applicable here. In the instant case one contract is silent as to the content of an entirely different contract; the writing of the one does not preclude proof of the existence of the other.

Exhibits 5 and 6 are silent as to the subject matter of Exhibit B. Exhibits 5 and 6 are concerned with the purchase and sale of a business; Exhibit B represents a memorandum of an oral agreement for a

contract of employment. Exhibit B is not inconsistent with Exhibits 5 and 6 and as between Auran and Johnson the latter two exhibits were not intended to be the "final statement of the whole of the transaction between them."

■ In specification of error No. 5 Auran contends that the trial court erred in not dismissing plaintiff's cause of action in that the alleged agreement was based upon "goodwill" which by law passed prior to the alleged oral agreement. Auran asserts that the verdict in favor of Mrs. Johnson was based upon the sale of goodwill to Richard Auran in exchange for a car for the rest of her life. Auran is here referring to the goodwill of the business as opposed to the goodwill services of Mrs. Johnson.

We held in Engstrom v. Larson, 77 N.D. 541, 44 N.W.2d 97 (1950), in Syllabus ¶ 5:

"5. The sale of a business will be presumed, in the absence of any expression to the contrary in the agreement of sale, to pass the good will of the business with other assets."

Auran maintains the consideration for the oral agreement evidenced by Exhibit B is invalid since the goodwill of the business passed prior to December 21, 1965, when Exhibit B was executed. Exhibit B explicitly states that the "goodwill" involved is that of the employment of Mrs. Johnson as a "goodwill representative of Auran Chevrolet Company" and nothing is said of the "goodwill of the business".

■ In an argument in chambers out of the presence and the hearing of the jury, counsel for Johnson urged that Johnson was to perform and did perform goodwill services separate from the sale of the business. Notwithstanding that contention, counsel also urged out of the hearing of the jury that Johnson was to perform and did perform services as an additional consideration for the sale of the business.

Since evidence submitted supported the first contention, the trial court did not err in not dismissing the plaintiff's complaint, the complaint having been enlarged by the evidence received relative to goodwill services separate from the sale of the business, without objection that it went beyond the scope of the pleadings. See Helgeson v. Locken, 130 N.W.2d 573 at 576 (N.D. 1964), and Rule 15(b), N.D.R.Civ.P.

Auran argues in specification of error No. 6 that Johnson, as the administratrix of the estate of her husband, breached her fiduciary duty to her husband's estate. The argument is that since Carmen Johnson was the sole owner of the shares transferred, absent those of Motors Holding, Dolores Johnson was transacting business in a fiduciary capacity and any personal gain as a result of such a transaction would be a breach of the duty and void. Auran cites Section 30-13-18, N.D.C.C.:

"Executor or administrator to make neither profit nor loss.—An executor or administrator shall not make profit by the increase nor suffer loss by the decrease or destruction without his fault of any part of the estate. He must account for the excess when he sells any part of the estate for more than the appraised value, and if any part is sold for less than the appraised value, he is not responsible for the loss if the sale has been made justly."

■ Since the jury could have found from the evidence and within the court's instructions that Johnson contracted for her personal goodwill services separate and distinct from the goodwill of the business, we cannot say that she breached a fiduciary duty.

Auran's final specification of error poses the question of whether the trial court erred in submitting Auran's counterclaim to the jury. Auran maintains he had established his claim against Johnson as a matter of law and therefore it was error for the jury to consider it. The jury found against Auran on the counterclaim.

We have reviewed the record in the lower court and find that Auran made no motion for a directed verdict on his counterclaim, nor did he make a motion for judgment notwithstanding the verdict as to his counterclaim.

Supposing for the sake of argument, a motion for a directed verdict on the counterclaim had been made, thus giving the trial judge an opportunity to consider the question, what standard would have been applied? In Rau v. Kirschenman, 208 N.W.2d 1 (N.D.1973), a wrongful-death action brought against the owner and driver of an automobile which overturned resulting in the death of a guest, this court considered the question of what standard applies in ruling as a matter of law on a motion for a directed verdict. From *Rau,* in Syllabus ¶ 3, we find that the evidence is to be evaluated in the light most favorable to the party against whom the motion was made. In this case that would be Johnson. Since evidence already reviewed in the light most favorable to Johnson was found sufficient to support a verdict in her favor, no purpose would be served in reviewing the evidence again. It is sufficient to note that Auran was not entitled to the direction of a verdict even if he had made one, since under the evidence viewed in the light most favorable to Johnson, the party against whom the motion would have been made, the question of the counterclaim presented a question of fact properly within the province of the jury to decide. There was no error in submitting the counterclaim to the jury.

Accordingly, the judgment and the order denying the motion for judgment notwithstanding the verdict or in the alternative for a new trial of the trial court are affirmed.

VOGEL, TEIGEN, PAULSON and KNUDSON, JJ., concur.