# IN THE SUPREME COURT
# STATE OF NORTH DAKOTA

## 2021 ND 160

Steve Hartman and Russell Hartman
as Co-Personal Representatives of
the Estate of Ray H. Hartman,      Plaintiffs, Appellants, and Cross-Appellees

v.

Trent Grager,                      Defendant, Appellee, and Cross-Appellant

## No. 20200205

Appeal from the District Court of Wells County, Southeast Judicial District, the Honorable James D. Hovey, Judge.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

Opinion of the Court by Jensen, Chief Justice.

Shawn A. Grinolds (argued) and Randall J. Bakke (on brief), Bismarck, ND, for plaintiffs, appellants, and cross-appellees.

Tyler J. Malm (argued) and David J. Smith (on brief), Bismarck, ND, for defendant, appellee, and cross-appellant.

**Jensen, Chief Justice.**

[¶1]   Steve Hartman and Russell Hartman, as personal representatives of the estate of Ray Hartman (the "Estate"), appeal from an amended judgment entered after a bench trial. The Estate argues Ray Hartman lacked the capacity to contract, no valid contract for the sale of his farmstead and farmland existed, Trent Grager owes rent for the 2017 farming season, and Ray Hartman did not gift a tractor to Trent Grager. Trent Grager cross-appeals, arguing he is entitled to compensation for the Estate's wrongful occupation of the farm.

[¶2]   We affirm in part, concluding the district court did not err in finding Ray Hartman was capable of contracting, the 2016 agreement was a valid contract for the sale of the farmstead and farmland, Trent Grager had no obligation to pay rent in 2017, and the tractor was gifted. We reverse in part, concluding the 2017 document did not supplement or alter the terms of the 2016 agreement, and Trent Grager is entitled to compensation for the Estate's wrongful occupation of the farm. We remand for the court to determine Trent Grager's damages for the Estate's wrongful occupation.

I

[¶3]   Ray and Patricia Hartman, husband and wife, owned land in Wells County, North Dakota. They had five children: Patti Rae "Trish" Greenwood, Steve Hartman, Shelly Dahl, Russell Hartman, and Darcie Grager. Trent Grager is the grandson of Ray and Patricia Hartman and the son of Darcie and Todd Grager. Ray Hartman made a living personally farming their land until his retirement.

[¶4]   In 2011, Ray Hartman began renting their farmland to Trent Grager, starting with 200 acres. From 2012 to 2017, he rented all of the farmland to him. Trent Grager was the only family member who rented and farmed Ray and Patricia Hartman's land after Ray Hartman retired. To aid in his farming endeavors, Ray Hartman purchased a John Deere tractor for Trent Grager to

use for farming purposes. In the spring of 2012, Ray and Patricia Hartman began discussing with Trent Grager the sale of their land to him. Trent Grager estimated they discussed the sale 10 to 15 times over the years, and he had further conversations about the prospective purchase with his parents and his banker.

[¶5] Patricia Hartman died in March 2016. In August 2016, Ray Hartman sustained significant injuries in a car accident. He spent over three weeks in the hospital, and then was admitted to a nursing home, where he lived until his death in March 2017. While in the nursing home, Ray Hartman's children and his friend, Dale Ripplinger, noticed some decline in his cognitive abilities. Trent Grager, his wife, Katie Grager, and Ray Hartman's attorney, Paul Murphy, did not notice any cognitive impairment.

[¶6] While residing in the nursing home, Ray Hartman signed three documents evidencing a transfer of his farmstead and farmland to Trent Grager. First, in September or October 2016, Ray Hartman and Trent Grager signed an undated handwritten document providing (1) a breakdown of acreage numbers totaling 795; (2) "Farmstead = ~ 13 acres" written above "100,000"; and (3) "45 per acre" written above "35,775." Second, on November 29, 2016, during a visit to the nursing home, Trent Grager and Ray Hartman jointly drafted a document which reads, "I <u>Ray Hartman</u> sell <u>Trent Grager</u> the farmstead for $<u>100,000</u> and all the land I own at $45, per acre" ("2016 agreement"). Ray Hartman wrote his name, the price for the farmstead ("100,000"), and the price per acre for the farmland ("45, per acre"). The document was signed and dated by both, noting Ray Hartman as "Seller" and Trent Grager as "Buyer." Third, in February 2017, Ray Hartman and Trent Grager signed identical but separate typewritten purchase agreements, purporting to sell the farmstead and farmland to Trent Grager ("2017 document"). Ray Hartman was independently represented by attorney Paul Murphy, who visited him twice at the nursing home, with Ray Hartman signing the 2017 document on the second visit. Trent Grager did not deliver his acceptance of the 2017 document to Ray Hartman prior to his death. No closing on the sale of the land occurred.

[¶7]   After Ray Hartman's death, the family held a meeting and agreed to rent the farmland to Trent Grager for the 2017 growing season. Trent Grager farmed the land in 2017. The Estate rented the land to other individuals in 2018 and 2019.

[¶8]   In July 2017, the Estate sued Trent Grager for unlawful possession of the tractor and the abstracts to the real property.[1] Trent Grager counterclaimed, alleging that he is entitled to specific performance of the 2017 document, including conveyance of a deed for the real property, and that he owns the tractor. Trent Grager did not allege specific performance of either the first handwritten document or the 2016 agreement at this time.

[¶9]   Both parties were granted leave by the district court to amend their pleadings. The Estate asserted the additional claims of exploitation of a vulnerable adult, rent for the 2017 growing season, and damages for loss of use of the tractor. Trent Grager sought to reform the 2017 document to correct certain scrivener's errors and alleged a breach of contract claim, in addition to his original counterclaims.

[¶10] The Estate moved for partial summary judgment to dismiss Trent Grager's counterclaims, arguing the 2017 document is unenforceable and Ray Hartman owned the tractor until his death. Trent Grager responded and presented the first handwritten document and the 2016 agreement in support of his argument.

[¶11] The district court granted the motion in part, and denied it in part. The court concluded the facts surrounding the purported gift of the tractor are disputed, rendering summary judgment inappropriate on that issue, and reserving it for trial. The court concluded the 2017 document was not a valid contract because there was no proof that Trent Grager delivered his acceptance of the agreement to Ray Hartman before his death. The court noted the first handwritten document and the 2016 agreement were not pled, and were raised

---

[1] The Estate also sued Todd and Darcie Grager. Those claims were dismissed by the district court, and are not at issue on appeal.

3

for the first time in response to summary judgment. The court dismissed the claim of specific performance of the 2017 document.

[¶12] Following summary judgment, Trent Grager moved for leave to amend his counterclaim. The district court granted the motion in part, allowing Trent Grager to seek specific performance of the 2016 agreement.

[¶13] After a bench trial, the district court concluded Ray Hartman was mentally competent to contract, and that the 2016 agreement and 2017 document together constitute a valid contract for the sale of the real property. Specifically, the court found that offer and acceptance of the agreement occurred at the execution of the 2016 agreement and "the additional details were spelled out" in the 2017 document. The court reformed the 2017 document to correct the scrivener's errors, vacated its partial summary judgment to the extent it was inconsistent, and concluded the tractor was a gift from Ray Hartman to Trent Grager. The court denied Trent Grager's claim for damages for failure to close on the property, and the Estate's claims for reimbursement of the abstract update fees, exploitation of a vulnerable adult, damages for loss of the use of the tractor, and rent for the year of 2017. The Estate appealed, and Trent Grager cross-appealed.

II

[¶14] The Estate argues the district court erred in concluding Ray Hartman possessed sufficient mental capacity to contract for the sale of his farmstead and farmland. Our standard of review on capacity to contract is well-established:

> A district court's finding on capacity, or lack of capacity, is a question of fact. We will not set aside a district court's finding of fact unless it is clearly erroneous. A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if no evidence supports it, or if, on the entire record, we are left with a definite and firm conviction a mistake has been made. In a bench trial, the district court determines credibility issues, which we will not second-guess on appeal. We do not reweigh evidence or reassess credibility, nor do we reexamine findings of fact made

4

upon conflicting testimony. We give due regard to the trial court's opportunity to assess the credibility of the witnesses, and the court's choice between two permissible views of the evidence is not clearly erroneous. A court's findings of fact must reflect the basis of its decision and enable this Court to understand its reasoning. Findings of fact are adequate if we can discern the court's rationale for its decision.

*Vig v. Swenson*, 2017 ND 285, ¶ 14, 904 N.W.2d 489 (cleaned up).

[¶15] "All persons are capable of contracting except minors and persons of unsound mind." N.D.C.C. § 9-02-01. "A conveyance or other contract of a person of unsound mind, but not entirely without understanding, made before the person's incapacity has been determined judicially upon application for the appointment of a guardian is subject to rescission as provided by the laws of this state." N.D.C.C. § 14-01-02. "Before a court may set aside a transaction on the ground of mental incapacity, the party attacking the validity of the transaction has the burden to prove the grantor, at the time of the transaction, was so weak mentally as not to be able to comprehend and understand the nature and effect of the transaction." *Vig*, 2017 ND 285, ¶ 12. "Old age alone does not render a person incompetent, even if the mind is weak or impaired or even if capacity to transact general business may be lacking." *Erickson v. Olsen*, 2014 ND 66, ¶ 22, 844 N.W.2d 585 (quoting *Estate of Wenzel-Mosset by Gaukler v. Nickels*, 1998 ND 16, ¶ 13, 575 N.W.2d 425).

[¶16] The district court concluded the Estate failed to prove that Ray Hartman was so weak mentally as not to be able to comprehend and understand the nature and effect of the transactions when he signed the 2016 agreement and the 2017 document. At trial, all five of Ray Hartman's children testified to his capacity. Additionally, Dale Ripplinger, Trent Grager, Katie Grager, Dr. Rodney Swenson, and Paul Murphy provided testimony.

[¶17] The district court made the following findings of fact regarding the testimony of Ray Hartman's children:

Steve Hartman testified that Ray had difficulty remembering names and had confused Steve's birthday with another of Ray's sons. He also testified that when a bull got loose from the pasture Ray knew right where they would find him based on prior occurrences. Several witnesses testified about a late night phone call from Ray wanting ice for his water.

Ray's daughter, Trish Greenwood, is a registered nurse and also testified that Ray had trouble remembering directions to places he had travelled previously. After Ray's car accident, Trish noticed changes in Ray's behavior, including that he could be irritable, crabby, and rude. On September 30, 2016, Ray executed a power of attorney naming Trish his attorney-in-fact for health care purposes. The estate does not contest the validity of this power of attorney. On this date, Trish noted that Ray's short-term memory was poor, but his past memory was better. Darcie Grager became Ray's attorney-in-fact under a general durable power of attorney. The estate does not contest the validity of the general durable power of attorney. At no time did anyone seek a guardianship or conservatorship for Ray. . . .

Ray's daughter, Shelly Dahl, also testified that Ray was getting forgetful about names and faces and that Ray was in the nursing home because he needed help physically. She also testified that Ray had difficulty recognizing his own mailbox. Ray was also confused about the date of [his wife's] death. . . .

Ray's son, Russell Hartman, also testified that Ray was becoming forgetful about names and familiar places, and that all of the siblings had concerns about Ray's mental status. Russell also testified that at times his dad could carry on a good conversation, especially about events from Ray's younger days. Russell testified that in December of 2016, there were times when dad was "himself."

Darcie Grager testified she was not concerned about her father's cognitive abilities or memory while he was living in the nursing home. However, she acknowledged that her prior communications indicated she believed her father was psychologically failing. The court found that Ray Hartman's friend, Dale Ripplinger, testified that Ray Hartman's short-term memory was "slipping."

[¶18] The district court found that both Trent Grager and his wife, Katie Grager, did not notice a decline in Ray Hartman's cognitive abilities while in the nursing home, stating:

> Trent did not notice a decline in Ray's cognitive abilities or that Ray was confused. Trent's wife Katie testified. She is a financial planner for Thrivent Financial and deals with elderly clients. She is trained to recognize vulnerable adults. She knew Ray for 2 years before his death and would go with Trent to visit Ray in the nursing home 3-4 times per month. She testified that Ray would "light up" when Trent came in the room. Ray remembered her by name every time she came and remembered the type of ranch Katie grew up on. Katie testified that as a financial advisor she would be comfortable meeting with Ray and that she did not see any change in Ray's mental health in the nursing home.

[¶19] None of Ray Hartman's treating physicians, nurses, or caregivers at the hospital or nursing home testified at trial. Dr. Rodney Swenson, a neuropsychologist, offered his expert opinion and testified on behalf of the Estate. The district court noted:

> Ray's medical and nursing home records were conditionally admitted for foundation and were relied upon by Dr. Rodney Swenson in giving an expert opinion. It was Dr. Swenson's opinion, based on record review, that in August of 2016 Ray suffered from vascular dementia and that on the date of the [2016 agreement], November 29, 2016, Ray had a BIMS test indicating moderate cognitive impairment. On Ray's admission to the nursing home, Dr. Swenson noted that Ray had a CAST score of 53, which would indicate a severe impairment. The persons who administered those tests did not testify. Dr. Swenson is a clinical and neuropsychologist, but never had an opportunity to examine Ray during Ray's lifetime. Dr. Swenson acknowledged that Ray had never been diagnosed with Alzheimer's or non-Alzheimer's dementia.

7

[¶20] The district court found Paul Murphy represented Ray Hartman during the execution of the 2017 document. Murphy met with him once in January 2017 and once in February 2017 for approximately 30-45 minutes each time. The court found:

> Mr. Murphy has been an attorney since 1994 and practices what he describes as "small town law," including estate planning and land transactions. He estimates that he has conducted four to five land transactions per year for the last 10 years. He has also had experience dealing with older clients. Mr. Murphy has also had experience in dealing with incapacitated persons in the course of guardianship proceedings. Mr. Murphy had never represented Ray Hartman prior to this transaction. He first met with Ray Hartman on January 11, 2017. Mr. Murphy's purpose for this first meeting was to gauge Ray's ability to understand the transaction, make sure that Ray knew what he was doing, and that Ray understood the terms and was not being taken advantage of. Ray indicated to Mr. Murphy that he wanted to sell the farmland to Trent at "$45 an acre and 100 on top." Mr. Murphy had no reservations about Ray's mental capacity and believed that Ray was clear that he wanted to make the transaction to Trent. Mr. Murphy did not have the drafted [2017 document] with him at this first meeting.

> Mr. Murphy next met with Ray on February 10, 2017, in Ray's room at the nursing home. Ray remembered who Mr. Murphy was. Mr. Murphy reviewed the contract with Ray page by page. Ray was again very clear of what he wanted to happen with his land and signed the [2017 document]. Mr. Murphy had no doubt that Ray knew what he was doing when he signed the [2017 document]. During both of the meetings, Mr. Murphy discussed with Ray the fact that the price for the sale of the land was very low and inquired about what Ray's children may think. Ray's responses indicated that he understood he was selling the land below fair market value and that it was none of his kids' business.

[¶21] The Estate claims Ray Hartman lacked the mental capacity to contract, noting the only expert opinion came from Dr. Swenson, who testified that Ray Hartman suffered from vascular dementia and that he could not have understood the consequences of entering into an agreement for the sale of his land in November 2016 or anytime thereafter.

[¶22] The Estate had the burden to prove that Ray Hartman was so weak mentally as not to be able to comprehend and understand the nature and effect of contracting for the sale of his land. *Vig*, 2017 ND 285, ¶ 12. The district court found the Estate failed to meet its burden. We will not set its finding on capacity aside unless no evidence supports it, or if, on the entire record, we are left with a definite and firm conviction a mistake has been made. *Id*. at ¶ 14.

[¶23] Trent Grager and Katie Grager testified they did not notice a decline in Ray Hartman's cognitive abilities while he was in the nursing home. Similarly, Paul Murphy testified he had no reservations about Ray Hartman's mental capacity during his representation. Katie Grager and Paul Murphy both testified they had advised elderly clients in their respective occupations, and Paul Murphy had experience in dealing with incapacitated individuals in the course of guardianship proceedings. The district court found that Dr. Swenson did not examine Ray Hartman during his lifetime, and that he acknowledged Ray Hartman had never been diagnosed with Alzheimer's or non-Alzheimer's dementia. We conclude there is evidence in the record supporting the district court's finding that Ray Hartman was competent to contract while in the nursing home.

[¶24] The Estate asserts that the district court erroneously found that Ray Hartman's November 29, 2016 BIMS test only evidenced moderate cognitive impairment. According to Ray Hartman's nursing home records, a BIMS— Brief Interview for Mental Status—test was given to Ray Hartman by a nurse on November 29, 2016. The records show Ray Hartman correctly repeated the three words provided to him, but was later unable to recall those words. Further, he correctly reported the year, but was either unable to report the correct day of the week and month, or did not answer. The test score was a 6, which Dr. Swenson testified indicates *severe impairment* of cognitive abilities. Thus, the court misstated Dr. Swenson's testimony when it noted, "It was Dr. Swenson's opinion, based on record review, that in August of 2016 Ray suffered from vascular dementia and that on the date of the [2016 agreement], November 29, 2016, Ray had a BIMS test indicating *moderate cognitive impairment*." (Emphasis added.) Whether this disturbs the court's finding on capacity to contract is a separate question.

9

[¶25] The nurse who administered the BIMS test did not testify at trial. Dr. Swenson prepared two reports on Ray Hartman's mental capacity. In neither report did he mention the BIMS test, let alone rely on the test in forming his opinion. Although Dr. Swenson testified that Ray Hartman's BIMS score indicates he suffered from severe cognitive impairment, he acknowledged that neither the BIMS nor CAST (nor any test) is determinative of one's capacity to contract. The BIMS test is but one piece of evidence among many pieces that the district court may weigh in considering the issue of capacity to contract. On the entire record, we are not left with a definite and firm conviction the court made a mistake in assessing Ray Hartman's capacity to contract.

[¶26] Although the district court misstated Dr. Swenson's testimony on the BIMS test, the court was aware of Dr. Swenson's opinion that, based on his record review, Ray Hartman suffered from vascular dementia. After the court's misstatement, the next immediate sentence in its findings of fact provides, "On Ray's admission to the nursing home, Dr. Swenson noted that Ray had a CAST score of 53, which would indicate a severe impairment." Later in its findings, the court stated it "is not persuaded that Ray suffered from a *substantial* mental impairment that *grossly* impaired his judgment, behavior, or ability to live independently or provide self-care." Thus, the court rejected the Estate's view of the evidence, and accepted the testimony of Paul Murphy, Trent Grager, and Katie Grager. The district court is in a better position to weigh conflicting evidence and assess the credibility of witnesses, *Estate of Wenzel-Mosset by Gaukler v. Nickels*, 1998 ND 16, ¶ 17, 575 N.W.2d 425, and has chosen between two permissible views of the evidence. Accordingly, the court's finding of capacity is not clearly erroneous.

III

[¶27] The Estate argues the district court erred in concluding a valid contract for the sale of Ray Hartman's farmstead and farmland existed.

> [W]hether an unambiguous written agreement constitutes a valid contract is a question of law for the court. However, we have noted that the determination of mutual consent, although resulting in a legal conclusion, necessarily involves factual questions. Thus, the

10

determination of the existence of a contract is a purely legal question only when mutual consent, and the other requisite elements of a contract, are demonstrated clearly and unambiguously on the face of the written contract.

*Ehlen v. Melvin*, 2012 ND 246, ¶ 8, 823 N.W.2d 780 (quoting *Jerry Harmon Motors, Inc. v. First Nat'l Bank & Trust Co.*, 472 N.W.2d 748, 752 (N.D.1991)).

[¶28] The district court concluded in its order for partial summary judgment that the 2017 document was not a valid contract because Trent Grager did not deliver his acceptance of the agreement to Ray Hartman prior to his death. The court noted the 2016 agreement was not pled, and was presented for the first time in response to summary judgment. Because the counterclaim sought specific performance of the 2017 document, not the 2016 agreement, and the summary judgment motion sought dismissal of that counterclaim, the court granted dismissal of the specific performance counterclaim.

[¶29] Following summary judgment, Trent Grager moved for leave to amend his counterclaim. The district court granted the motion in part, allowing Trent Grager to seek specific performance of the November 29, 2016 handwritten agreement. Trent Grager and Ray Hartman jointly drafted that document which reads, "I <u>Ray Hartman</u> sell <u>Trent Grager</u> the farmstead for $<u>100,000</u> and all the land I own at $45, per acre." Ray Hartman wrote his name, the price for the farmstead ("100,000"), and the price per acre for the farmland ("45, per acre"). The document was signed and dated by both, noting Ray Hartman as "Seller" and Trent Grager as "Buyer."

[¶30] After trial, the district court found offer and acceptance occurred at the execution of the 2016 agreement, and "the additional details were spelled out" in the 2017 document. The court concluded that the 2016 agreement and the 2017 document together constituted a valid contract for the sale of the farmstead and farmland, and satisfied the statute of frauds. The partial summary judgment order was vacated to the extent it was inconsistent with the findings of fact, conclusions of law, and order for judgment.

[¶31] The Estate asserts the 2016 agreement is not a valid contract for the sale of real property. A valid contract requires parties capable of contracting, consent of the parties, a lawful object, and sufficient consideration. N.D.C.C. § 9-01-02. Consent must be free, mutual, and communicated by each party to the other party. N.D.C.C. § 9-03-01. Under N.D.C.C. § 9-03-16, consent is not mutual unless the parties all agree upon the same thing in the same sense. "The parties' mutual assent is determined by their objective manifestations, not their secret intentions." *Ehlen*, 2012 ND 246, ¶ 9. Consideration is "[a]ny benefit conferred or agreed to be conferred upon the promisor by any other person to which the promisor is not entitled lawfully, or any prejudice suffered or agreed to be suffered by such person, other than such as that person, at the time of consent, is lawfully bound to suffer as an inducement to the promisor." N.D.C.C. § 9-05-01.

[¶32] All four requirements of N.D.C.C. § 9-01-02 were met in executing the 2016 agreement. Having concluded the district court did not err in finding Ray Hartman competent, both he and Trent Grager were capable of contracting. *See* N.D.C.C. § 9-02-01 ("All persons are capable of contracting except minors and persons of unsound mind."). Both parties drafted and signed the same agreement, demonstrating their consent to be bound by it. The Estate did not claim fraud or challenge the court's conclusion that it failed to prove exploitation of a vulnerable adult and undue influence. Further, the farmstead and farmland are unquestionably lawful objects, and the 2016 agreement expresses sufficient consideration: $100,000 for the farmstead, and $45 per acre for the land.

[¶33] The Estate argues the 2016 agreement lacks the essential terms of a contract for the sale of real property, and is too vague, indefinite, and uncertain to be specifically enforced. We have held an agreement for the sale of real property need only show who the contracting parties are, intelligently identify the subject matter involved, express the consideration, and disclose the terms and conditions upon which the contract is entered into. *Johnson v. Auran*, 214 N.W.2d 641, 650 (N.D. 1974) (citing *Hoth v. Kahler*, 74 N.W.2d 440, 441, Syl. 1 (N.D. 1956)). All of these minimal requirements are present in the 2016 agreement. The contracting parties are identified as Ray Hartman and Trent

Grager. The property being sold included Ray Hartman's farmstead and "all the land [he] own[ed]." This description is readily ascertainable, and in fact was stipulated to by the Estate and Trent Grager prior to trial. A legal description is unnecessary in the sale agreement. *Rohrich v. Kaplan*, 248 N.W.2d 801, 804 (N.D. 1976). Further, the consideration was expressed, and the only explicit terms and conditions are that Ray Hartman sell his farmstead and land to Trent Grager, and Trent Grager tender payment to Ray Hartman in the amounts provided.

[¶34] The Estate argues the price is uncertain because the 2016 agreement does not specify the total purchase price to be paid, or the total acreage to which the $45 per acre price is to be applied. This level of specificity is not required. "To be specifically enforceable, a contract must fix the price or consideration clearly, definitely, certainly, and unambiguously, or provide a way by which it can be fixed with certainty." *Lumley v. Kapusta*, 2016 ND 74, ¶ 7, 878 N.W.2d 65 (cleaned up). Because the acreage of Ray Hartman's land was fixed at the execution of the agreement on November 29, 2016, the price too was fixed and is ascertainable.

[¶35] The 2016 agreement is unambiguous, and reasonably definite and certain in its terms. *See Stout v. Fisher Indus., Inc.*, 1999 ND 218, ¶ 11, 603 N.W.2d 52 (stating a contract must be reasonably definite and certain in its terms so as to ascertain what is required of the parties). Accordingly, the 2016 agreement was a valid contract for the sale of Ray Hartman's farmstead and farmland.

[¶36] In its partial summary judgment order, the district court concluded that the 2017 document was not a valid contract due to Trent Grager's untimely acceptance. In its order for judgment following trial, the court concluded the 2017 document contained the parties' additional terms. Trent Grager, however, did not accept the 2017 document prior to Ray Hartman's death, and thus did not timely accept those additional terms. *See* N.D.C.C. § 9-03-19 ("Consent is deemed to be communicated fully between the parties as soon as the party accepting a proposal has put that party's acceptance in the course of transmission to the proposer . . . ."); N.D.C.C. § 9-06-08 ("A contract in writing

13

takes effect upon its delivery to the party in whose favor it is made or to that party's agent."); N.D.C.C. § 9-03-23(4) ("A proposal is revoked . . . [b]y the death . . . of the proposer before acceptance of the proposal."); *Cooke v. Blood Sys., Inc.*, 320 N.W.2d 124, 128 (N.D. 1982) ("A contract requires an offer, an acceptance of an offer, and a mutual acceptance and understanding between the offeror and the offeree as to the terms of the obligation."). Thus, the 2017 document fails for lack of mutual assent.

[¶37] Moreover, a written contract "may be altered by a contract in writing or by an executed oral agreement and not otherwise. An oral agreement is executed within the meaning of this section whenever the party performing has incurred a detriment which that party was not obligated by the original contract to incur." N.D.C.C. § 9-09-06. Because the 2016 agreement was a written contract, it may only be altered by a subsequent written contract or by an executed oral agreement. No executed oral agreement was presented to the district court or argued on appeal. The 2017 document appears to contain at least one different term in the price of the real property. The 2017 document provides a price of $138,540, whereas in the 2016 agreement the price is $100,000 plus $45 per acre. Although the court did not make a finding on the total acreage, evidence in the record indicates it is an altered term. Specifically, the undated handwritten document signed by both parties indicates 795 acres were to be priced at $45 per acre for an amount of $35,775, in addition to the $100,000 for the farmstead, which would equal a total price of $135,775. Accordingly, the 2017 document was not a valid contract, and it did not supplement or alter the terms of the 2016 agreement.

[¶38] The Estate asserts the following terms are missing from the 2016 agreement: a closing date, the type of deed to be delivered, whether any warranties are being given by the seller (i.e. environmental, condition of the premises, etc.), whether any improvements or fixtures are included, whether there are any contingencies to closing (i.e. financing, sufficiency of title, etc.), whether the personal property contained in the house or outbuildings are included, an earnest money provision, terms of payment (i.e. cash sale, seller financed, etc.), terms regarding abstracts or title examination, any warranties of title, whether any disclosures are being given, such as Megan's law or lead

14

based paint, whether inspections will be performed, and how taxes will be allocated.

[¶39] Section 9-07-21, N.D.C.C., provides, "All things that in law or usage are considered as incidental to a contract or as necessary to carry it into effect are implied therefrom, unless some of them are mentioned expressly therein." *See also Hoth*, 74 N.W.2d at 447 (quoting 81 C.J.S. *Specific Performance* § 35, pp. 494-96) ("Where . . . all the essential elements of a contract are stated, a failure to include other provisions which might properly have been incorporated does not prevent a decree of specific performance; and terms which the law implies need not be expressly stated."); *Ellingstad v. State, Dep't of Nat. Res.*, 979 P.2d 1000, 1008 (Alaska 1999) (noting that "[w]here a contract is silent on an issue, a court may supply reasonable terms to fulfill the parties' expectations"). Thus, if a contract does not provide for incidental terms, the law provides those terms in order to carry into effect the agreement of the parties.

[¶40] "An agreement to sell real property binds the seller to execute a conveyance in form sufficient to pass the title to the property." N.D.C.C. § 47-10-02. If the parties do not specify the type of deed to be conveyed, it is implied that a general warranty deed was intended. *Hoth*, 74 N.W.2d at 441, Syl. 2. The law implies the seller will convey marketable title free from encumbrances. *Id.* at 452. Good and marketable title means "title in fee simple, free from litigation, palpable defects, and grave doubts, a title which will enable the owner not only to hold it in peace but to sell it to a person of reasonable prudence." *Overboe v. Overboe*, 160 N.W.2d 650, 654 (N.D. 1968). Unless the land sale agreement provides otherwise, the deed shall contain the "usual covenants" of title. *Hoth*, at 451; *see also Cameron v. Scherf*, 62 N.W.2d 884, 886-87 (S.D. 1954) (holding that where option to purchase was silent as to the kind of deed to be provided, the usual covenants of title were implied). "An agreement on the part of a seller of real property to give the usual covenants binds the seller to insert in the grant covenants of seizin, quiet enjoyment, further assurance, general warranty, and against encumbrances." N.D.C.C. § 47-10-03. The covenants in section 47-10-03 must be in substance as provided in N.D.C.C. § 47-10-04.

[¶41] The law presumes the sale of real property includes fixtures, as defined under N.D.C.C. § 47-01-05, unless the parties contract otherwise. *See* N.D.C.C. § 47-01-03 (stating that real property consists of land and that which is affixed to land); 36A C.J.S. *Fixtures* § 4 (2021) (stating that "fixtures ordinarily pass in a conveyance of the land except to extent that the transferring parties expressly agree otherwise"); *Blake-McFall Co. v. Wilson*, 193 P. 902, 907 (Or. 1920) (noting the common law rule that "all fixtures annexed to the realty pass by a conveyance of the freehold, unless they have been excepted from the conveyance in some manner sanctioned by the law"); *Power v. Garrison*, 81 S.E. 225, 227 (Ga. 1914) (noting that a conveyance of land in fee ordinarily passes title to gin machinery attached to the land, unless the agreement provides otherwise). Personal property is not conveyed in a land sale agreement, unless otherwise provided. *See* N.D.C.C. § 47-01-07 (defining personal property as every kind of property that is not real property).

[¶42] If the time of performance is not specified, a reasonable time is allowed. N.D.C.C. § 9-07-22. "If the act in its nature is capable of being done instantly, as for example if it consists in the payment of money only, it must be performed immediately upon the thing to be done being exactly ascertained." *Id.*; *see also Overboe*, 160 N.W.2d at 654 ("[W]here the agreement states the selling price but fails to stipulate the terms of payment, payment must be made in cash within a reasonable time."). Therefore, the parties are allowed a reasonable time to perform, or close, on the sale of the farmstead and farmland. "Determination of what a reasonable time may be is a question of fact, depending upon the particular circumstances of each case." *Huber v. Oliver Cty.*, 529 N.W.2d 179, 182 (N.D. 1995).

[¶43] The Estate contends that Trent Grager failed to close within a reasonable time, amounting to a failure of consideration. "Failure of consideration arises when a valid contract has been formed, but the performance bargained for has not been rendered." *Check Control, Inc. v. Shepherd*, 462 N.W.2d 644, 646 (N.D. 1990). "Where there is a total failure of consideration, the non-breaching party is excused from performing its obligations under the contract." *Id.* at 647. "Generally, determination of whether there has been a failure of consideration is a question of fact." *Irish*

*Oil and Gas, Inc. v. Riemer*, 2011 ND 22, ¶ 23, 794 N.W.2d 715. "Only when the evidence is such that reasoning minds could draw but one conclusion does the fact question become a question of law." *Id.* The district court found Trent Grager was capable of closing on the property within a reasonable time from the execution of the 2016 agreement. This finding is not clearly erroneous. The agreement was executed on November 29, 2016, while Ray Hartman lived at the nursing home. Ray Hartman did not leave the nursing home prior to his death. Trent Grager sought financing from his bank, which was approved on January 24, 2017. Ray Hartman died on March 5, 2017. In a letter dated April 21, 2017 from the attorney of Steve Hartman and Russell Hartman to Trent Grager's attorney, the Estate effectively informed Trent Grager it would not close on the property. Although this was in reference to the 2017 document, the letter asserted, as the Estate does now, that Ray Hartman lacked the capacity to contract. Thus, it is apparent the Estate was unwilling to close on the property, regardless of which document was presented to the Estate. In July 2017, the Estate filed this suit. Because Trent Grager was capable of closing within a reasonable time and the Estate was unwilling to close on the property, Trent Grager's delay in performance was reasonable, and we conclude the court's finding is not clearly erroneous. Here, because the Estate's only argument there was a failure of consideration was premised on the assertion Trent Grager did not perform within a reasonable amount of time, the Estate's assertion there was a failure of consideration fails. Under the circumstances, Trent Grager's delay in performance is not unreasonable, and there is not a failure of consideration.

[¶44] We conclude the 2016 agreement was a valid contract for the sale of Ray Hartman's farmstead and farmland. The district court erred in determining the 2017 document became a part of the contract for the sale of the farmstead and farmland.

## IV

[¶45] The Estate argues the district court erred in concluding that Trent Grager had no obligation to pay rent for his use of the farmland in 2017.

17

[¶46] Trent Grager testified his farming season typically begins at the start of May, and he planned to own the land prior to the beginning of the 2017 season. In the April 21, 2017 letter, the attorney for Steve Hartman and Russell Hartman indicated that it was their understanding that Trent Grager planned on closing on the property on April 21, 2017. The letter informed Trent Grager that the Estate was not going to close on the property. Accordingly, because there was a valid contract for the sale of the real property, and Trent Grager would have owned the farmland for the 2017 farming season if not for the Estate's failure to close on the property, the district court did not err in denying the Estate rent for the 2017 season.

V

[¶47] The Estate contends the district court erred in concluding Ray Hartman gifted the John Deere tractor to Trent Grager.

[¶48] "A gift is a transfer of personal property made voluntarily and without consideration." N.D.C.C. § 47-11-06. A valid inter vivos gift requires: (1) an intention by the donor to then and there give the property to the donee, coupled with an actual or constructive (2) delivery of the property to the donee, and (3) acceptance of the property by the donee. *Matter of Estate of Feldmann*, 2017 ND 255, ¶ 5, 903 N.W.2d 280. "An oral gift is not valid unless the means of obtaining possession and control of the thing are given, nor, if it is capable of delivery, unless there is an actual or symbolical delivery of the thing to the donee." N.D.C.C. § 47-11-07. "Where a claim of a gift is not asserted until after the death of the alleged donor, the evidence must be clear and convincing of every element requisite to constitute a gift." *Estate of Feldmann*, ¶ 5. We review both the district court's findings of fact as to whether a gift was made and whether a party acted with donative intent under the clearly erroneous standard of review. *Kohler v. Flynn*, 493 N.W.2d 647, 650 (N.D. 1992) (gift); *Doeden v. Stubstad*, 2008 ND 165, ¶ 19, 755 N.W.2d 859 (donor intent).

18

[¶49] The Estate argues there is no evidence of an actual transfer of ownership, and Ray Hartman did not intend to gift the tractor to Trent Grager, as evidenced by Ray Hartman purchasing the tractor and depreciating it for tax purposes.

[¶50] The district court concluded the tractor was a gift and made the following findings of fact. Ray Hartman purchased the tractor in 2014, when he was retired. Trent Grager and his father, Todd Grager, accompanied Ray Hartman to the dealership. Upon completion of the sale, Ray Hartman presented Trent Grager with the purchase order. Trent Grager took possession of the tractor when it was delivered and he used it for farming. Trent Grager was solely responsible for maintenance. Ray Hartman never used the tractor. Trent Grager testified that when Ray Hartman handed him the purchase order, he told Trent Grager, "I hope it's a good tractor for you." Before the purchase, Ray Hartman had discussed with Trent Grager his intention to buy him a tractor. Todd Grager testified that Ray Hartman told him that he was going to buy Trent Grager a tractor. Trent Grager testified that he and Ray Hartman agreed that Ray Hartman would be able to depreciate the tractor for tax purposes.

[¶51] The district court found the only evidence of Ray Hartman owning the tractor was the fact that he depreciated it on his tax returns. Tax returns, however, are not conclusive evidence that a gift was made, or was not made. *See Chase v. Blackstone Distributing Co.*, 294 A.2d 392, 397 (R.I. 1972) (stating that a gift tax return is not conclusive evidence that a gift was made); *In re Rudell Estate*, 780 N.W.2d 884, 892 (Mich. Ct. App. 2009) (noting the absence of a gift tax return was not conclusive evidence that property was not gifted); *Gruen v. Gruen*, 488 N.Y.S.2d 401, 407 (N.Y. App. Div. 1984) (concluding that donor's failure to file a gift tax return for painting, where the value was more than the applicable gift tax exclusion, did not establish a lack of donative intent), *aff'd*, 496 N.E.2d 869, 872-73 (N.Y. 1986).

19

[¶52] This Court does not reweigh the evidence, reassess witness credibility, or substitute its judgment for the district court's decision merely because we may have reached a different result. *Estate of Feldmann*, 2017 ND 255, ¶ 6. The district court chose between two permissible views of the evidence. Accordingly, we conclude the court did not err in finding Ray Hartman gifted the tractor to Trent Grager.

VI

[¶53] In his cross-appeal, Trent Grager argues the district court erred by concluding he is not entitled to compensation for the Estate's use and occupation of the farm. Trent Grager asserts the court misapplied the law on damages.

[¶54] "In an action for specific performance, a purchaser may recover damages from a seller for delay in conveying real property and the costs, if any, of recovering possession of the land." *Matrix Properties Corp. v. TAG Investments*, 2002 ND 86, ¶ 10, 644 N.W.2d 601 (citing N.D.C.C. § 32-03-21). Section 32-03-21, N.D.C.C. provides, in relevant part, "The detriment caused by the wrongful occupation of real property . . . is deemed to be the value of the use of the property for the time of such occupation . . . and the costs, if any, of recovering the possession." "[T]he value of the use may be found by requiring the party at fault to make an accounting and deliver over the fruits of the illegal possession, or to pay the fair rental value of the property." *Matrix Properties*, ¶ 29 (citing *Bumann v. Maurer*, 203 N.W.2d 434, 438 (N.D. 1972)).

[¶55] The district court made the following findings:

> Had the sale of the farmland occurred as contemplated by the writings, it was Trent's intent to farm the land himself. Trent did not provide any testimony regarding profits or losses from previous years farming the land. Trent seeks damages in the amount of $100 per acre[] based on the fact that the estate received that as rental income for the 2018 and 2019 growing seasons. Trent has not shown to the Court what his damages would have been had he farmed the land. Additionally, Trent failed to mitigate

20

his own damages. The estate offered to rent the farmland to Trent for $90 an acre and Trent declined.

[¶56] The district court concluded the land should have been sold to Trent Grager in 2017. We affirmed that ruling above. Since the Estate did not close during that period, it was in wrongful occupation of the farm, and Trent Grager may recover damages from the Estate for its delay in conveying the property. The court noted the Estate profited from the land in 2018 and 2019, but required Trent Grager to prove his hypothetical income if he had been able to farm the land. The court misapplied the law, and erred by not allowing him to prove the value of the use of the property for the time of occupation, which can be shown by either identifying the fruits of the illegal possession, or through fair rental value of the property. The Estate received $100 per acre in rents for both 2018 and 2019 by third parties. This fact was stipulated to by the parties prior to trial, and was subsequently testified to at trial. This is sufficient proof of the fruits of the Estate's improper possession of the farm, and Trent Grager is owed rents for the 2018 and 2019 farming seasons.

[¶57] Trent Grager also contends he is entitled to the income generated from the time of trial until closing on the land sale. To the extent the Estate remained in possession after trial, we agree. On remand, we direct the district court to determine the value of the use of the property from trial until closing, using the standard articulated above. The Estate may offset damages for any expenses it incurred as a result of possessing the property from May 2017 to closing, including real estate taxes, property insurance, and the costs of maintaining and repairing the property.

VII

[¶58] The amended judgment is affirmed in part, concluding the district court did not err in finding Ray Hartman was capable of contracting, the 2016 agreement was a valid contract for the sale of the farmstead and farmland, Trent Grager had no obligation to pay rent in 2017, and the tractor was gifted. It is reversed in part, concluding the 2017 document did not supplement or alter the terms of the 2016 agreement, and Trent Grager is entitled to compensation for the Estate's wrongful occupation of the farm. We remand for

21

the court to determine damages for the Estate's wrongful occupation, offset by the Estate's expenses, and any other actions consistent with this opinion.

[¶59] Jon J. Jensen, C.J.
Gerald W. VandeWalle
Daniel J. Crothers
Lisa Fair McEvers
Jerod E. Tufte